**INTERNATIONAL LONGSHOREMEN'S & WAREHOUSEMEN'S UNION et al. v. ACKERMAN et al.**

Civ. Nos. 828, 836.

United States District Court
D. Hawaii, First Division.

Dec. 27, 1948.

As Amended Jan. 18, 1949.

Harriet Bouslog and Bouslog & Symonds, all of Honolulu, Hawaii, for plaintiffs.

Rhoda V. Lewis, Asst. Atty. Gen., Territory of Hawaii, and Wendell F. Crockett, Deputy County Atty,. County of Maui, of Wailuku, Maui, T. H., for defendants.

Before BIGGS, Circuit Judge, METZGER, Chief Judge, and HARRIS, District Judge.

BIGGS, Circuit Judge.

The two cases at bar may be disposed of in one opinion. The general jurisdiction of the court (its jurisdiction under Section 266 of the former Judicial Code and under Section 2281 of revised Title 28 of the United States Code, Annotated, effective September 1, 1948, aside) is alleged to be founded on the second, third and fourth Federal Civil Rights Acts, Act of May 31, 1870, 16 Stat. 140, Act of April 20, 1871, 17 Stat. 13, and Act of March 1, 1875, 18 Stat. 335, 337, R.S. §§ 1977, 1979, 8 U.S.C.A. §§ 41, 43, 44 and 46, and upon Section 24(14) of the Judicial Code of 1911, now Section 1343 of revised Title 28 U.S.C.A., and upon Amendments I, V, VI, XIV and XIX to the Constitution of the United States. Jurisdiction is also allegedly based upon Section 24(1) of the Judicial Code of 1911, now revised Title 28, Section 1331, U.S.C.A.[1]

The complaints at the two numbers are quite similar in substance. The International Longshoremen's & Warehousemen's Union (ILWU), a voluntary unincorporated association and labor union, is a plaintiff at each number; Kawano, individually and as a member of the ILWU and as president of what was the Territorial Council of the ILWU, is a plaintiff at No. 828. The no longer existent Territorial Council of the ILWU is also named as a plaintiff at this number. Rania, in his individul capacity and as president of the United Sugar Workers, ILWU, Local 142, is a plaintiff at No. 836. Both Rania and Kawano allege, as indicated, that they sue not only individually but in representative capacities on behalf of the ILWU's membership of approximately 30,000 persons in the Territory of Hawaii. The complaints assert that all other individual plaintiffs are residents of the Territory of Hawaii, members of the ILWU, and are daily wage earners in either the sugar industry or the pineapple industry of the Territory. This is found to be the fact. It is asserted that all the individual plaintiffs at both numbers, either ethnologically or as a matter of *mores* of the Islands,[2] are "members of races other than the Caucasian race". The particulars of these allegations were either proved or stipulated to.[3] The races of the individual plaintiffs referred to were variously alleged, and proved or stipulated, to be the Malayan, the Polynesian and the Mongolian, sub widely varying national strains, viz., Filipino, Hawaiian, Hawaiian-Caucasian, Chinese, Japanese, Portuguese and Puerto Rican. These facts possess significance only in relation to the challenges and motions made to the jury commissioners of the Circuit Court of the Second Circuit of the Territory of Hawaii and to the motions and challenges made to the 1947 Maui County grand jury. Most of the individual plaintiffs are alleged, and proved or stipulated to be citizens of the United States. Some of the individual plaintiffs are alleged, and proved or stipulated to be aliens and citizens of the Philippine Republic, or aliens and citizens of Japan, or aliens and citizens of other nationalities. Again we deem these facts to be of significance only

---

[1] At No. 828, the plaintiffs by amendment set up jurisdictional amount and other allegations required by Section 24(1) of the Judicial Code of 1911, now revised Title 28, Section 1331. Similar allegations are contained in the original complaint at No. 836. Jurisdiction in the cases at bar, however, lies in the court by virtue of Title 8 U.S.C. § 43, R.S. § 1979, 8 U.S.C.A. § 43, the Civil Rights Acts referred to above and Section 1343 of revised Title 28. Jurisdiction is also vested in this court by virtue of Section 1337 of revised Title 28. See the heading, "The General Jurisdiction of the Court".

The allegations as to jurisdictional amounts contained in the amendment at No. 828 and in the complaint at No. 836 deal with losses allegedly suffered by the ILWU, not by any local, and by individual plaintiffs. Pertinent findings as to jurisdictional amounts are made in note 5, infra.

[2] This is applicable to Portuguese and Puerto Ricans and to persons whose ancestry contains either a Portuguese or a Puerto Rican strain, all of whom are considered by Island custom or *mores* to be non-Caucasians.

[3] See paragraph 2 of the stipulations of April 22, 1948 filed at Nos. 828 and 836.

in relation to the attack on the jury commissioners or upon the grand jury of Maui County.

The defendants at both numbers are identical except that the defendant, Jean Lane, Chief of Police of Maui County, sued individually and as chief of police at No. 828, is not named as a defendant at No. 836. The defendant, Walter D. Ackerman, Jr., Attorney General of the Territory of Hawaii, is sued individually and as attorney general. The Honorable Ingram M. Stainback, Governor of the Territory of Hawaii, is sued individually and as governor. E. R. Bevins, County Attorney of the County of Maui, and Wendell F. Crockett, Deputy County Attorney of the County of Maui, are sued individually and as County Attorney and Deputy County Attorney respectively. Judge Cable A. Wirtz, a Circuit Judge of the Territory of Hawaii, is sued individually and as one of the jury commissioners of Maui County. The jury commissioners and the 1947 grand jurors of the County of Maui are also sued individually and in their official capacities.

Both complaints allege mutatis mutandis that there were strikes conducted by the ILWU in the sugar and pineapple industries in the Territory; that in furtherance of the objectives of the strikes, viz., improvement in wages, hours and conditions of employment, the individual plaintiffs engaged in "lawful, peaceful and constitutionally protected activities of speech, press and assemblage and of peaceful picketing".

The complaint at No. 828 alleges that Lane, Chief of Police of Maui County, caused the individual plaintiffs (other than Kawano) to be arrested and charged them with violations of an act of the Territory generally known as the unlawful assembly and riot statute, Revised Laws of Hawaii 1945, c. 277, Sections 11570–11584; that the plaintiffs Barbosa, Maile, Degamo, Kaopuiki, Nitta, Ah Ho, Aikala, Yagi, Arruiza, Oda and Matsuura were charged in a complaint executed before a district magistrate of Maui County with violations of the same statute; and that the plaintiffs Makekau, Siruet, Baldua, Sipe and Mendes were similarly charged in a complaint also executed before a local magistrate. It is asserted also that the defendants Ackerman, Stainback, Bevins and Crockett have sought to present criminal charges framed on the complaints to the grand jurors of Maui County; that the defendants, Pombo and Chatterton, and Judge Wirtz, as jury commissioners, chose and composed Maui County grand juries in such a manner as to violate the constitutional rights of the plaintiffs and in violation of the laws of the United States and of the Territory of Hawaii.

The complaint goes on to recite that certain individual plaintiffs (particularly designated hereinafter) filed motions and challenges to the grand jury and to the methods employed in selecting its members for the reasons set out in the complaint, to be discussed hereinafter, that these charges and challenges were heard by the Honorable Albert M. Cristy, a Circuit Judge of the Territory of Hawaii, in mid-September 1947, but that he held the motions and challenges to be without merit, refusing to disqualify or to dismiss the grand jury. The plaintiffs then allege that the unlawful assembly and riot statute is unconstitutional in that it deprives them of their rights of free speech, press and assemblage and will subject them to criminal prosecutions if they exercise their constitutional rights. Agliam, Abraham Makekau, and thirty-four other additional plaintiffs were added as parties to the complaint by stipulation and by order of the court. It is alleged that these thirty-six individuals are held to bail under a complaint charging them also with violation of the unlawful assembly and riot statute.

The complaint closes with the prayers, inter alia, (1) that a temporary and permanent injunction issue from this court prohibiting the enforcement of the unlawful assembly and riot act against the plaintiffs and enjoining the submission to the grand jury of facts relating to the plaintiffs' actions for indictment based on the unlawful assembly and riot act; (2) that this court declare the statute to be unconstitutional; (3) that we adjudge the method used in selecting the grand juries of Maui County to be unconstitutional and contrary to law and order the grand jury discharged; and (4) that a three judge

court be convened pursuant to Section 266 of the Judicial Code of 1911, to determine the case.

The complaint at No. 836 attacks not only the unlawful assembly and riot statute referred to in the complaint at No. 828, but also attacks the conspiracy statute of the Territory of Hawaii, Revised Laws of Hawaii 1945, c. 243, Sections 11120–11130. It asserts inter alia that the defendants Ackerman, Stainback, Bevins and Crockett presented "purported criminal charges alleging violation of the * * * unlawful assembly and riot statute and the conspiracy statute" to the grand jurors of Maui County who returned an indictment [4] against the individual plaintiffs (other than Rania) based on the two statutes referred to. The complaint then makes the same allegations respecting the jury commissioners and the means employed in selecting grand juries as are set out in the complaint at No. 828 and alleges that the unlawful assembly and riot statute and the conspiracy statute are unconstitutional. The complaint then goes on to assert that the defendants in two criminal complaints entitled Territory of Hawaii v. Diego Barbosa, et al., and Territory of Hawaii v. Abraham Makekau, et al., pending in the Circuit Court of the Second Circuit, referred to at length hereinafter under later headings, challenged the means employed to select the grand juries of Maui County; that these challenges were heard by Judge Cristy and were disposed of unfavorably to the defendants. It is alleged also that all the defendants in the criminal complaints referred to are plaintiffs at No. 836.

The complaint asserts that unless the unlawful assembly and riot statute and the conspiracy statute are held to be unconstitutional and void all the plaintiffs will be deprived of their constitutional rights and "that it is necessary and imperative that this court assume jurisdiction in the matter and restrain and enjoin defendants from prosecuting or taking any further proceedings in connection with that certain indictment pending in the Circuit Court for the Second Circuit, Territory of Hawaii, entitled Territory of Hawaii v. Joseph Kaholokula, et al., being Criminal Number 2365 * * *, in order that the plaintiffs shall have an impartial, representative and democratic Grand Jury." [5]

The complaint ends with prayers substantially identical with those of the complaint at No. 828 but the first prayer asks specifically that the defendants Ackerman, Bevins and Crockett be enjoined from prosecuting or taking any further proceedings in connection with the Kaholokula indictment, Criminal No. 2365, now pending in the Circuit Court of the Second Circuit.

---

[4] This is No. 2365 in the Circuit Court of the Second Judicial Circuit. Cf. the earlier indictment of October 30, 1946, Plaintiffs' Exhibit No. 9, referred to hereinafter under the subheading "Evidence".

[5] The complaint at No. 836 contains a paragraph (XXI) which is devoted in substance to the financial losses and alleged damage to the ILWU and to the individual plaintiffs. As we have stated like allegations are set up in the amendment to the complaint at No. 828. The financial losses in each case are alleged to be in excess of $3,000. In the view we take of the cases, insofar as jurisdiction is concerned, these allegations are immaterial.

But, if we are wrong in our decisions, to the end that the causes may not have to be remanded by the reviewing Court for further findings, we find that losses resulting to the ILWU by reason of the enforcement of the unlawful assembly and riot act of Hawaii were in excess of $3,000. We find that the enforcement of the statute caused a decrease in the membership of the union which loss resulted in the loss of dues to the union in excess of the amount of $3,000.

As a matter of law these losses, since they resulted indirectly to the ILWU, are not cognizable as legal damages.

There are no allegations in either the complaint at No. 828, as amended, or in the complaint at No. 836, that individual locals of the ILWU suffered damages. Indeed, no local is named as a plaintiff in either action.

The damages to the individual plaintiffs in either action are not cognizable in terms of money.

This note and the findings contained therein are to be read in conjunction with those in note 1, supra.

Upon presentation of the complaints to the United States District Court for the District of Hawaii, Senior District (now Chief) Judge Metzger issued rules to show cause and restraining orders in the usual form. Due to circumstances over which the court had no control, delays were encountered in convening a court to dispose of the cases. Motions were filed by the defendants in both cases for more definite statements, for the dismissal of the actions, for summary judgments, and for dismissal of the actions as to particular defendants on the grounds of misjoinder or lack of jurisdiction. Upon the convening of a court of three judges argument was had on these motions, briefs were filed and all were considered carefully by the court. On April 19, 1948 we entered an order denying the motions to make the claims more definite and certain, for summary judgments and for dismissal of the actions. The motions for dismissal as to particular defendants on the grounds of misjoinder or lack of jurisdiction were retained by the court for further consideration. At the request of the court, counsel entered into extensive stipulations respecting many undisputed facts. Answers were filed. It was in effect agreed by the parties that the court should proceed to final hearing,[6] the defendants expressly reserving all their rights, including the right to renew every objection theretofore made by them or any of them as to the jurisdiction of the court over the parties, the causes of action alleged, or in respect to any other material matter. On April 23, 1948, and on successive days thereafter, the court heard the testimony of some thirty witnesses and received a very substantial number of exhibits. On the agreement of counsel for all the parties and with the permission of the court, the already voluminous record was supplemented with further exhibits. Briefs and requests for findings of fact

and conclusions of law were filed later by the parties.

Evidence, Save as to that Relating to the Challenges to the Jury Commissioners and the Grand Juries of Maui County.

For the sake of clarity we deem it desirable, if not necessary to break down the statement of facts in this opinion into two parts. The first will deal with the labor picture in Hawaii and the incidents growing out of the strikes in the sugar and pineapple industries in the Territory. We will then discuss the law applicable to those facts. The second part of the fact statement will deal specifically with the motions and challenges to the jury commissioners and to the grand juries of Maui County. The second statement of facts will be found at a later point in this opinion and, immediately following it, a discussion of the pertinent law.

The ILWU and the Labor Picture.

Hall, the Regional Director of the ILWU, testified that in 1944 the ILWU was engaged in organizing the sugar and pineapple workers in the Territory; that the ILWU, following the organizational work referred to, represented substantially all [7] of the sugar workers and a majority of the pineapple workers in the Islands; that the ILWU had spent about $350,000 in the organization work and that it cost between $600,000 and $700,000 to administer the union in the course of a year and that this money was collected from dues-paying members. He stated also that as of 1943 the wages of the adult male workers had been fixed at $1.84 a day by the War Food Administrator.[8] To this was added a 15% bonus. At the time of the trial before us the approximate daily rate of pay of plantation common laborers or plantation harvesters was "well in excess of $8.00 per day". The witness made it

---

[6] Mr. Justice Stone and Mr. Justice Cardozo in their concurring opinion in Borden's Farm Products Co. v. Baldwin, 293 U.S. 194, at page 213, 55 S.Ct. 187, at page 193, 79 L.Ed. 281, stated, "We are in accord with the view that it is inexpedient to determine grave constitutional questions upon a demurrer to a complaint, or upon an equivalent motion, if there is a reasonable likelihood that the production of evidence will make the answer to the questions clearer." Such a likelihood existed in the instant cases.

[7] Hall stated that only about 250 workmen, employees of two small companies, did not become members of the ILWU.

[8] See also Plaintiffs' Exhibit No. 1, S.D. No. 169, War Food Administration, Food Distribution Administration, Sugar Branch, issued June 25, 1943.

plain that in the contracts negotiated with the sugar and pineapple industries by the union on behalf of its members there were and are no provisions for the arbitration of wage issues and that no employer in the two industries had ever submitted a wage issue to arbitration, and that the point on which negotiations had ruptured, bringing on the strikes referred to, was that of pay.

Hall testified also in substance that the enforcement of the unlawful assembly and conspiracy acts had necessitated a decision to terminate the pineapple workers' strike. He said as well that " * * * during the sugar strike a considerable number of our members were charged with the violation of the Unlawful Assembly Statute, and because I was in consultation almost daily with the elected strike committee, we were informed by the workers on Maui that the charge had struck almost, you might describe it as terror into the workers involved there, because they felt that for carrying on legitimate picket activity and to face a sentence of twenty years meant that everything was being thrown at them, and the strike could not be effective." He said in respect to a contemplated strike by longshoremen, members of the ILWU, that "it would be in effect suicide for the union to attempt to strike with such a statute hanging over their heads, a statute that could easily be invoked and has been in our opinion, or where there have been minor disturbances that might have been provoked by agents provocateur."

Hall's testimony stands virtually uncontradicted and we find his statements to be true. We think that we are entitled to find on this record, and we do find, that the ILWU, at all times pertinent to the instant disputes, has served and is serving as the collective bargaining agent for the sugar and pineapple workers in the Territory of Hawaii.

The labor picture and the sociological background of the sugar and pineapple industries in the Territory of Hawaii are indeed extraordinary. Ten owners own half of all privately owned land in Hawaii.[9]

The tendency in both industries has been toward larger plantations and toward the elimination of the so-called "adjacent planter" who by his very situation has become economically dependent on the large plantation close to him. As is stated in the authority cited in footnote 9 supra and on the same page referred to in the note, "The land tenure system is quite different from that in any other part of the United States and is a legacy of the feudal system under native royalty which preceded annexation. At that time such lands as were suitable for sugar cultivation were owned in large tracts and were, therefore, leased or purchased in large tracts for plantation purposes. Nearly half of the land is still leased * * * Hawaiian sugar production from its very inception was on a larger scale than is typical of mainland farming. As the plantations have decreased in number, the output of the industry as a whole has increased in value." As the larger plantations have absorbed the smaller ones, a result economically though perhaps not socially desirable, the necessity of the majority of the inhabitants being employed by the larger operating companies has increased to the point where the bulk of the population on the "growing" islands could not exist without such employment. Moreover, most, if not all, of the employees live in company houses in company towns and the tenure of their homes is dependent on their employment. Conversely, the companies cannot prosper or even operate without the labor, skilled and unskilled, of the residents of the growing islands. What has been said in respect to sugar growing is largely applicable to the pineapple industry as well.

The raising of sugar cane and the growing of pineapples are the two major industries of the Territory of Hawaii. A very substantial portion of the products of these industries moves in commerce to the mainland of the United States. For example the raw sugar which the Territory of Hawaii has produced and will continue to produce in such vast quantities is sent almost entirely to the mainland for proc-

---

[9] See "Labor in the Territory of Hawaii, 1939", United States Department of Labor, Bulletin No. 687, Table 6 and notes cited to text at page 23. This bulletin is Plaintiffs' Exhibit No. 19.

essing. These facts are common knowledge, of which we may take judicial notice, but see "Hawaii", published by the United States Department of the Interior, January 30, 1948, at pp. 8 and 19.

The tendency in both the sugar and pineapple industries, as the result of inexorable economic law operating against plantation owner or manager has been to compel them to get labor as cheaply as possible. To this end for over a hundred years, whether the owner or plantation manager has been native king or prince, Englishman, American or German, he has endeavored to bring into the Islands workers to cultivate his fields and harvest his crops as cheaply as possible. The nationalities imported have been Chinese, Japanese, Koreans, Okinawans, Samoans, Filipinos, Portuguese, Spaniards and Puerto Ricans.[10] There are even some persons of African or Afro-American descent on the Islands. The more numerous nationalities and their several racial backgrounds have mixed with the Americans of Caucasian ancestry or with the native Hawaiians; they have mixed very well indeed. There is presently little, if any, purely racial strife in the Territory and most of the nationalities and their progeny have made common cause in the interest of higher wages and better working conditions against the plantation owner or operator who is generally a "haole" or of the haole class or group. This has not always been true. See "Hawaii: a History", Kuykendall and Day, Prentice-Hall, Inc., 1948, at p. 275.

A satisfactory definition of the word "haole" is hard to encompass. It was defined by a witness [11] in the instant proceedings as generally "a person of mainland America[n] or of northern European stock * * *, not a person of Portuguese, Spanish or Porto Rican descent". The word by simple dictionary definition means "white, foreign".[12] Romanzo Adams, late professor of sociology at the University of Hawaii in his book "Interracial Marriage in Hawaii" [13], put a gloss

---

[10] As an example of the wide national mixture we may state that one of the witnesses before this court testified that his nationality was "Chinese, Hawaiian, Samoan and Irish". See transcript p. 109.

[11] Testimony of Dr. John E. Reinecke, Transcript p. 213.

[12] "Introduction to the Hawaiian Language", Judd, Pukui and Stokes, Tongg Publishing Company, Honolulu, Hawaii.

[13] Published in 1937 by the Macmillan Company, pp. 114-6, 119. Mr. Adams wrote:

"In continental United States the people of the white race take themselves for granted and they classify the others and assign them their place in the social order. They are able to ignore any point of view different from their own. In Hawaii the white people were, for a long time, so few that the Hawaiians, who took themselves for granted, named and placed the other peoples. Of course they had to place (114) the British and Americans near the top, but the name, haole, was Hawaiian and it is best understood from the standpoint of Hawaiian experience. It has been necessary, therefore, in Hawaii for white people to see themselves somewhat as Hawaiians see them. They have accepted the Hawaiian designation, haole, and, of course, it has affected their conception of their role and their behavior.

"The word, haole, in the beginning meant stranger or outsider. It did not, at first, refer to color, but since nearly all of the early strangers, were white men it came to be applied in its unmodified form only to white people. * * *

" * * * When white men, mainly British and American, came to be somewhat numerous they occupied most of the important professional positions and they were executives and administrators, the owners of property and the initiators of policy. Of course there were many who occupied positions of minor importance, but even they were better paid than others and the way was more open to them for promotion. Thus the word came gradually to stand for a class of superior economic and social status. * * * It is reasonable to assume that the term, haole, was, for a long time, more significant of rank than of race. But as Hawaiians and part-Hawaiians in the more recent times have been learning to speak the English language and, with it, taking over other elements of American (115) and European culture, they are more or less coming to think in terms of race.

"It must be emphasized that the term, haole, acquired its meaning from Hawaiian experience and attitudes and that its use has become current among all the other peoples because it stands for something they feel to be unique in the posi-

on the word which we think is correct. Mr. Adams said that the word referred to "rank", rather than to "race". Actually the "haole" group in Hawaii is not far from being co-extensive with the entrepreneur and land-owning, land-controlling group. Specifically, the "haole" group control the companies for which the individual plaintiffs (except Kawano and Rania) in the instant cases work. The labor relations between the land-controlling and the working groups are tense and have been so for generations. Put simply, the situation is one which calls for moderation on both sides. Extreme measures whether undertaken by the employees or by the employers have afforded and will afford no relief. Each group is dependent on the other; both must regard each other's rights and privileges.[14]

The history of labor relations in the Territory of Hawaii has not been a happy one. On occasions that history has been bad indeed. It is certain that the 1924 strike of Filipino laborers and its attendant circumstances brought great strain to labor relations in the Territory and caused very substantial damage to them. In the eyes of the plantation owners and operators this strike was unjustifiable. It culminated in a riot at Hanapepe on the Island of Kauai in which four policemen and sixteen Filipinos were killed and a number of other persons wounded. Sixty of the seventy-six participants, who were laborers, were sentenced to prison terms, most, if not all, of them having been indicted under the unlawful assembly and riot act. Two of the defendants were sentenced to four

years and eleven months imprisonment; fifty-eight were sentenced to four years imprisonment and sixteen were acquitted. See The Hawaiian Annual for 1925, and the Honolulu Star-Bulletin, issues of September 9, 10, 11, 12 and 23, issues of October 10, 27 and issue of November 8, 1924.

An extraordinary feature of the prosecutions was the fact that the territorial government was apparently without funds to conduct them and accepted the support of the Hawaiian Sugar Planters' Association to pay special prosecutors. See the Honolulu Star-Bulletin of September 13, 1924. There was in effect an *arcing* of law enforcement from the regularly constituted territorial authorities to prosecuting attorneys employed, albeit in the name of the Territory, by the planters. The employment of special prosecutors has met with the approval of the Territorial Courts not only in cases involving labor disputes but in other criminal cases as well. It is an undesirable custom of long standing whereby on occasion the administration of public justice has in effect been brought into the hands of the private property owner. It has occurred most frequently, perhaps, in criminal cases growing out of such labor disputes as the Hanapepe incident. See Territory v. Soga, 20 Haw. 71. As to cases not involving labor disputes see Territory v. Robello, 20 Haw. 7, and Territory v. Chong Chak Lai, 19 Haw. 437, Ann.Cas. 1912B, 657.

The facts stated in the foregoing paragraphs are notorious and we take

---

tion of this group. As a local classificatory term its meaning is maintained not so much by the *haole* as by others. When some of the German plantation laborers won a better economic status the decision whether they were to be regarded as *haole* lay in part with the *haole* who might or might not give them social recognition, but more largely with the Hawaiians and others who might or might not be willing to treat them as *haole*." (116)

"Among the European immigrants of the nineteenth century the Portuguese were unique in relation to the status achieved. Coming mainly as plantation laborers they did not as promptly improve their status as did the Germans

and Norwegians. The Portuguese were much more numerous. Mainly they were illiterate and for a generation they were indifferent to schooling. In general culture they differed more from the *haole* than did most of the other European immigrants. Because they were numerous and because their status was a humble one for a long time, there came to be a pretty definite mental set in relation to them. That is, they were regarded as a separate people, the 'Portegee.'" (119).

[14] For additional material on this vital subject see "An Island Community", Lind, The University of Chicago Press, 1938, Movants' Exhibit No. 4, and "Hawaiian Americans", Burrows, Yale University Press, 1947.

judicial notice of them since they occurred within this jurisdiction. Contemporaneous accounts may be employed by the court on analogy to refreshing recollection. See Brown v. Piper, 91 U.S. 37, 42, 23 L.Ed. 200. It is interesting to note the Territorial law on this subject. See The Estate of His Majesty Kamehameha IV, 2 Haw. 715, 718, and Bishop v. Mahiko, 35 Haw. 608, 618–624. We think that the Filipino workers' strike and its attendant circumstances resulted in the amendment to Section 4351 of the Revised Laws of Hawaii 1925, effected by the Act of March 15, 1929, Laws of the Territory of Hawaii, Regular Session 1929, Act 4, p. 3, whereby the term of imprisonment which could be imposed for violation of the unlawful assembly and riot act of Hawaii was raised from five years to twenty years and we so find. The sentences of the convicted strikers had expired just as the Legislature convened in 1929 and there was evident fear that when these men returned to their people on Kauai some form of demonstration or labor trouble might result. The unlawful assembly and riot act of the Territory of Hawaii is discussed at length under a later heading of this opinion.

### The Incidents Which Led to the Instant Suits.

The complaints and the indictments referred to in the pleadings and evidence in the cases at bar grow out of a number of occurrences, some involving a measure of violence, which arose in turn from strikes in the sugar and pineapple industries. The first occurrence, upon which defendants in the cases at bar lay considerable emphasis, took place at Paia on the Island of Maui and is referred to by common agreement as the "Paia incident". Others took place on the Island of Lanai (part of Maui County), one at the Kaumalapau harbor and wharf, the loading place for Lanai City, another occurring at or near Lanai City itself. These are generally described as the "Lanai incidents". There were other occurrences (some on the Island of

Oahu) germane to the issues of the law presented by the instant cases and certain of these will be discussed hereinafter. A strike of the sugar workers in the Territory of Hawaii commenced on September 1 and lasted until November 19, 1946.[15] This strike in effect was won by the union. A strike of the pineapple workers of the Territory commenced on July 10 and continued to and including July 15, 1947. This strike was lost by the union primarily because of the enforcement of the unlawful assembly and riot act.

### The Paia Incident.

We will deal first with the Paia incident which occurred on October 16, 1946 while the sugar workers' strike was in progress. Maui Agricultural Company is a sugar company having its mill at Paia on the Island of Maui, Maui County. A public highway known as Baldwin Avenue lies between the company's office and its mill. Prior to October 16, 1946 there had been extensive picketing of the company's mill with but little, if any, police interference. The hour set for the commencement of mill operations on the day the incident occurred was 7:00 a. m. Before the mill whistle blew, five persons, long-time residents of Maui and union men who had gone out on strike, appeared on the scene, desiring to return to work. One of them, Moniz, on the previous day had requested of Captain Long of the Paia police detail protection in getting through the pickets to go to work. After receiving this request Long had followed Moniz across the street to the picket line in front of the mill but the pickets stood shoulder to shoulder and would not let Moniz through though requested to do so both by him and by Long. Moniz then said that he was coming back "to go to work tomorrow".

Long reported this matter to Assistant Chief of Police Andrew Freitas and on the following day, the 16th, Freitas went to the scene with additional men of the regular police force from the Wailuku District. When the police arrived "orderly picket-

---

[15] Except at the Pioneer Mill Company, Lahaina, where the sugar workers' strike continued until January 2, 1947. It is asserted that the strike continued until the day last mentioned because of the refusal of the company to reinstate certain strikers. The point is immaterial in the decision of the litigations.

ing"[16] was going on. There was a line on the mill side of the street in double column. A few minutes after 6:45 a. m. the line at the mill entrance was increased to four columns, the number of pickets being between three and four hundred. After certain preliminary conversations between members of the ILWU, Kealoha,[17] Joseph Kaholokula,[18] and others, respecting the entry of the five workmen to the mill it was stated by Kaholokula that if the five men tried to cross the picket line, "police or no police", there would be violence and bloodshed.

When the mill whistle blew the five men started across the street toward the mill entrance escorted by the police. Nelson Souza, one of the men seeking admittance, was ahead with Captain Long beside him. About two hundred of the pickets left the picket line and converged, blocking the road and the mill entrance. Souza tried to get through the line at the point where Awana[19] was but the latter braced himself and the mass of union men, without using their hands, pushed the group seeking entrance to the mill back about five feet. At this point both Freitas and Kaholokula called out that the men should stop the fracas, be quiet and listen. Freitas then read to the crowd Section 11773 of the Revised Laws of Hawaii 1945,[20] which provides a rather substantial penalty for "Loitering". Thereafter, a second attempt was made by the five men and the police to get through the line of union men and into the mill. Awana, who previously had kept his arms on his breast, this time stretched them out to enlarge the barrier. No blows were struck but the group of five workmen and the police were pushed ten to twelve feet back across the avenue. Freitas asked the five workmen if they desired to try to get into the mill again and they replied that they did not wish to make a third attempt. Freitas then informed the union men that the attempt to put the five workmen into the mill was over, and he and Kaholokula had breakfast together and in fact exchanged congratulations

[16] So described in the defendants' brief.

[17] Kealoha was not an employee of the Maui Agricultural Company. He had come to Paia the previous day from Honolulu. He was, apparently, a kind of special agent of the ILWU.

[18] Whose first cousin, William Kaholokula, was one of the five men who sought admittance.

[19] One of the plaintiffs at No. 836 and subsequently a defendant in proceedings in the Circuit Court of Maui County, Second Circuit, as will appear in this opinion.

[20] Section 11773 is as follows: "Any person who shall loiter, or loaf, or idle upon any public highway, street, or sidewalk, thereby impeding or rendering dangerous the passage of pedestrians or others lawfully using the public highway, street, or sidewalk, or thereby in any way imperiling the public welfare or thereby tending in any way to cause a breach of the peace, is guilty of a petty misdemeanor and upon conviction thereof shall be punished by a fine of not less than twenty-five dollars nor more than two hundred fifty dollars or imprisonment for not less than thirty days nor more than ninety days, or by both fine and imprisonment."

The statute is very similar in tenor to that, Laws of the Territory of Hawaii 1929, Act 256, Section 1, p. 351, held unconstitutional in Territory of Hawaii v. Anduha, 9 Cir., 48 F.2d 171. The Act of May 8, 1929 provided in pertinent part, "Any person who shall habitually loaf, loiter and/or idle upon any public street or highway or in any public place, shall be guilty of a misdemeanor, and upon conviction thereof be punished by a fine of not more than one hundred dollars or by imprisonment for not more than one year, or by both such fine or imprisonment."

There is a conflict in the testimony as to whether Freitas read Section 11773, the so-called "Loitering" law, or whether he read Sections 11574–11584 of the Revised Laws of Hawaii 1945, or perhaps only Section 11570 thereof, dealing with "Riots and Unlawful Assemblies", the unlawful assembly and riot act of the Territory of Hawaii. Freitas testified that he read Section 11773, the "Loitering" act; Awana testified that Freitas read from the unlawful assembly and riot act and the trespass statute, Section 11751. Counsel for the plaintiffs contend that Section 11771, dealing with vagrants, beggars, pickpockets, etc., was also read and it is pointed out that the "Loitering" law was not included in a small mimeographed copy of certain laws prepared by the police apparently in view of the strike situation. We find that Freitas named correctly the section which he read.

that the incident had come to an end without physical injury to any one.

After this occurrence picketing continued at Paia until the issuance by the Circuit Court of the Second Circuit of an ex parte temporary injunction in Maui Agricultural Company, Limited v. International Longshoremen's and Warehousemen's Union, et al., Equity No. 325, limiting even peaceful picketing to three persons, the court stating in its opinion that picketing should be so restricted because of the territorial statute relating to unlawful assembly. See pp. 91-2 of the transcript of record in the appeal in the case of International Longshoremen's Union v. Wirtz, 9 Cir., 170 F. 2d 183, in the United States Court of Appeals for the Ninth Circuit. Logically, under the provisions of the statute as they will appear hereinafter, Judge Wirtz should have restricted picketing to two persons, not three. An application was made to Supreme Court of the Territory for a writ of prohibition to issue against Judge Wirtz of the Circuit Court of the Second Circuit of the Territory of Hawaii to compel him to vacate the injunction. In International Longshoremen's Warehousemen's Union et al. v. Wirtz et al., 37 Haw. 404, rehearing denied, 37 Haw. 445,[21] the Supreme Court of Hawaii, holding that the Norris-LaGuardia Act, 29 U.S.C.A. §§ 101–115, was not applicable to the territorial courts of Hawaii, refused to issue a writ of prohibition against Judge Wirtz to compel him to vacate the ex parte injunction restricting picketing previously referred to. The decision of the Supreme Court of Hawaii was affirmed, as we have said, by the Court of Appeals for the Ninth Circuit. It should be noted that Judge Wirtz' decision constitutes an important contemporaneous construction of the application of the unlawful assembly and riot act.

Following the Paia incident a complaint was sworn out before a district magistrate and subsequently seventy-eight members of the ILWU were arrested. The complaint is not in the record before us but there is evidence from which we find that it was based on the unlawful assembly and riot act. Later an indictment [22] charging seventy-eight persons [23] with violation of the unlawful assembly and riot act was returned by the 1946 grand jury of the Second Judicial Circuit of the Territory of Hawaii (Maui County) on October 30, 1946. Of these persons, at least seventy-five were members of the ILWU. Seventy-five of these defendants are plaintiffs at our No. 836.

Benjamin Awana, one of the plaintiffs at No. 836, testified that to his knowledge four persons who were named as defendants in the 1946 indictment were not present at the time the incident occurred. He named these four as (Dondo) Tomita, Hitoshi Sera, Johnny Nishimura and Frank Matsui. His testimony in this regard is substantiated in part by the fact that three of the four individuals whom he named, viz., Tomita, Nishimura and Matsui, were not included in the subsequent indictment of December 2, 1947 returned by the Maui County grand jury.[24] We find as a fact that the three individuals last named were

---

21 The case of Maui Agricultural Company, Limited, v. International Longshoremen's and Warehousemen's Union et al., Equity No. 325, in the Circuit Court of the Second Judicial Circuit, Territory of Hawaii, did not go beyond the temporary injunction stage because of the application for writ of prohibition referred to in the text and because the case became moot at the termination of the strike.

22 Plaintiffs' Exhibit No. 9, Indictment of October 30, 1946, returned by the 1946 Maui County grand jury.

23 One man named as a defendant in the indictment, Jose Pias, was dead on October 16, 1946.

24 For the sake of clarity we state that Plaintiffs' Exhibit No. 9 referred to in the opinion is the indictment returned on October 30, 1946 by the Maui County grand jury, viz., the grand jury of the Second Judicial Circuit of the Territory of Hawaii. The indictment of December 2, 1947 at Criminal No. 2365 was returned by the 1947 grand jury of the Second Judicial Circuit (Maui County) of the Territory of Hawaii. This is Exhibit E to the complaint at No. 836. Exhibit No. 9 incorrectly bears a stamped number "2365". The indictment returned on December 2, 1947 by the Maui County 1947 grand jury (Exhibit E to the complaint at No. 836) is actually No. "2365".

not present during the occurrence of the Paia incident. But it is to be noted that Tomita, Nishimura and Matsui were under indictment, charged with violation of the unlawful assembly and riot act for more than a year before the Supreme Court of Hawaii held the indictment to be invalid for reasons stated hereinafter. See Territory of Hawaii v. Kaholokula, et al., 37 Haw. 625. See also the facts relating to the finding of the indictment of December 2, 1947 under the next heading of this opinion. Roy Yasunaga, who also was named in the first indictment, was omitted in the second. No reason for the omission is supplied by the record. It is probable that he also, though arrested because of the Paia incident, took no part therein.

The facts last stated are of importance because of the very wide net which the police and prosecuting officers of Maui County threw about the workers who were on strike. This point will be amplified when the first Lanai incident is discussed. The arrests following both the Paia incident and the first Lanai incident were in fact made in mass.

It is desirable to point out here that Freitas and the other police officers had no intention of invoking prosecution of the strikers under the unlawful assembly and riot statute of the Territory at the time of the happening of the Paia incident or until they had conferred with Deputy County Attorney Wendell F. Crockett of Maui County to determine the form which the complaint should take. We find Assistant Chief of Police Freitas to be a most credible witness and we accept his testimony with but one minor exception as indicated in note 25, infra. He stated that in Maui County complaints are prepared by the police and are taken to the County Attorney's office for perusal. Freitas stated that Mr. Crockett instructed him to make up the complaint in question "to read unlawful assembly". While we recognize the duty of a prosecuting officer to determine the form and the substance of a complaint, the invocation of the unlawful assembly and riot statute possesses unusual significance when viewed in the light of other pertinent circumstances of the cases at bar.[25]

Facts Relating to the Testing of the Constitutionality of the Unlawful Assembly and Riot Statute by Kaholokula and Others.

The defendants named in the indictment of October 30, 1946, Joseph Kaholokula, et al., contested the validity of the unlawful assembly and riot act and the sufficiency of the indictment in the Circuit Court of the Second Circuit. When these issues were decided unfavorably to them in that court they took an appeal to the Supreme Court of Hawaii. This appeal was possible by virtue of Section 9531, Revised Laws of Hawaii 1945, which provides for an appeal of an interlocutory order of a nisi prius court. The Supreme Court on November 26, 1947 held the statute to be constitutional but ruled also that the indictment was insufficient in that it contained no allegations of "the acts done or actually begun to be done in furtherance of the unlawful assembly." See Territory of Hawaii v. Kaholokula et al., supra, 37 Haw. at page 642. It should be noted that the Supreme Court of Hawaii held also that a riot is an offense under the act though no order to disperse, by proclamation or otherwise, has been given or made. See 37 Haw. at pages 638, 639. Kaholokula and all of his co-

---

25 It should be pointed out that prior to the occurrence of the Paia incident there had been but few (probably but four) arrests arising in connection with the sugar workers' strike. All had been made at Lahaina for minor offenses. One was for assault and battery when a member of the union struck a supervisor. The second arrest was for malicious injury when a union man was accused of closing an irrigation ditch. The last two arrests were made when two union members were charged with pull-

ing the ignition wires from the distributor of a supervisor's automobile.

See transcript in the cases at bar, pp. 363-4. Cf. p. 116 and pp. 131-2. Freitas' testimony at pp. 363-4 respecting the arrest of Mac Masato Yamauchi seems to have been in error. See the indictments, Plaintiffs' Exhibit No. 6, which charge Yamauchi with offenses which took place on November 6, 1946. See also Plaintiffs' Exhibit No. 31, Freitas' examination of Yamauchi which recites the same date. The Yamauchi in-

defendants in the indictment of October 30, 1946, except Pias, deceased, and four others, Matsui, Nishimura, Dondo Tomita and Yasunaga, were reindicted by the 1947 grand jury of the Circuit Court of the Second Circuit, at No. 2365, for breach of the unlawful assembly and riot statute in count 1, and for conspiracy to, commit a felony, third degree, in count 2. Masao Sera was also named in the second indictment. It should be noted that there had been no remittitur by the Supreme Court to the Circuit Court in the Kaholokula case referred to before Kaholokula, his former co-defendants and one additional defendant, were indicted by the 1947 Maui County grand jury for offenses growing out of the Paia incident. These facts must be referred to again at a later point of this opinion. The prosecution of Kaholokula and his co-defendants under the new indictment has not been proceeded with because of the temporary restraint issued by this court at No. 836.

## The Yamauchi Incident.

Mac Masato Yamauchi, a carpenter employed at the Pioneer Mill Company, Ltd. at Lahaina, was also charged with violation of the unlawful assembly and riot statute. See the two complaints against Yamauchi and others, Plaintiffs' Exhibit 5. Yamauchi's actions were a contributing, if not the primary, cause of an assault and battery upon certain other employees of Pioneer who were set upon by a large number of other strikers in order to prevent further irrigation from an irrigation ditch. The complaint states that the offenses occurred on November 6, 1946. Yamauchi and those who allegedly acted under his orders were named by the 1946 Maui County grand jury in two indictments returned on December 12, 1946. The first indictment, numbered 2379, Plaintiffs' Exhibit No. 6, contained three counts, "Riot", "Conspiracy-Third Degree" and "Assault

and Battery". The second indictment, numbered 2380 but also designated as Plaintiffs' Exhibit No. 6, contained similar counts. Yamauchi pleaded nolle contendere to the assault and battery charges, and the other charges, riot and conspiracy, were nolle prossed.

## The Lanai Incidents.

While the Kaholokula case was pending in the Supreme Court of Hawaii there occurred the incidents on the Island of Lanai referred to in the complaint at our No. 828. The individual plaintiffs at No. 828, other than Kawano, were employed by the Hawaiian Pineapple Company at or near Lanai City, Maui County, at the times when the incidents occurred. We will deal immediately with that Lanai incident which occurred first.

The Hawaiian Pineapple Company owns the Island of Lanai. The Island is entirely populated by employees of the company and their families, totaling about 4000 persons. See "Hawaii", p. 11, published by the United States Department of the Interior, supra. The company maintains a wharf at Kaumalapau Harbor about seven miles distant from Lanai City to the end that the pineapples harvested on its plantations in and about Lanai City may be shipped to market. Pineapples are brought from the fields in specially constructed bins ready to be loaded on a pineapple barge when one is brought to dock. On the day of the incident, July 14, 1947, about eleven[26] bins of pineapples, picked before the strike on the plantations of the Hawaiian Pineapple Company and brought to Kaumalapau Harbor, lay on the dock. The company intended to trans-ship them to a barge which was about to be brought into the harbor. A white line, a *kapu*[27] line, had been painted on the land side of the road to designate the outer boundary of the company's property.[28] *Kapu* signs were posted along this line. About 3:00 P.M. there were fifteen or sixteen men near the

cident is discussed at a later point in this opinion.

[26] It should be noted that the customary load for a barge is 152 bins of pineapples which are usually shipped for canning within forty-eight hours after picking lest they turn sour.

[27] The Hawaiian word *kapu* means "forbidden". See "Introduction to the Hawaiian Language". See note 12, supra.

[28] See Defendants' Exhibits C-1, 2 and 5.

wharf, sitting on the sea wall. About 3:-30 P.M. truck loads of union men began to arrive at the wharf until there were about three hundred present. There was some picketing. About 4:00 P.M. the expected barge came in and was secured to the wharf. The picketing which had ceased temporarily began again headed by five union "picket policemen", one of whom was Diego Barbosa.[29] While this was going on employees of the company, who ordinarily worked in supervisory capacities and who were non-union men, began to take positions on and about the bins, obviously with the intention of loading the pineapples on the barge. Among these employees were Harrington and Johnson. Another supervisory employee, Fernandes, started to operate the crane.

Barbosa ran toward the pineapple bins and across the *kapu* line, signaling for the other men to follow him. All the men, as they crossed the *kapu* line, according to Freitas' testimony, yelled at the tops of their voices. Some of them mounted the bin on which Johnson and Harrington were working. Johnson escaped without injury but Harrington was punched and beaten about the head and body as was demonstrated by the motion picture film shown to this court.[30] The men who mounted the bins, broke them open and threw pineapples at the men on the tug and the barge. The supervisor, Fernandes, who had started to operate the crane, ran away pursued by at least fifteen men who punched at him. He was chased down a stairway to a lower portion of the wharf where he fell or jumped into the water. As he swam away his attackers threw pineapples at him, though none of these actually struck him. Another nonunion employee, Charles Marquis,[31] was also forced into the water but reached the protection of the barge. Freitas had only five police officers with him. He told Barbosa to call off his men, saying that the work would stop. Barbosa called the men back to the sea wall or road. The incident lasted about five minutes, the barge then leaving the pier.

Motion pictures were taken at the wharf by a police officer, by an engineer and draftsman employed by the Hawaiian Pineapple Company, and by a school principal. Stills were printed in Honolulu from the motion picture negatives. Some arrests for participation in the incident were made on the basis of reports by the police officers who were present and eleven persons, including Barbosa, were named in a criminal complaint, dated July 16, 1947, based on the unlawful assembly and riot act.[32] On August 1, 1947, about two weeks after the incident, a complaint was filed against Agliam and fifty-one additional defendants.[33] This complaint also was based on the unlawful assembly and riot Act [34] and will be referred to hereinafter from time to time as the Agliam case. Before the preliminary hearing in the District Court [35] four persons were dropped [36] and after the preliminary hearing, the names of twelve more defendants were removed from the Agliam complaint.[37] The remaining thirty-six were held for action of the Maui County grand jury. The grand jury has not yet acted in respect to the case of Barbosa, et al., due to the restraining order issued by this court at No. 828, or in respect to the case of Agliam, et al.

---

[29] Sometimes referred to in the testimony as "Gigo". See for example p. 40 of the testimony before Young Wa, Acting Magistrate, designated in note 34, infra, as the "Lanai transcript."

[30] Defendants' Exhibit E-1.

[31] Referred to in the transcript before this court as "Makees". See p. 355.

[32] See Exhibit D attached to the complaint at our No. 828.

[33] See item 5, par. 7, stipulation 4/23/48 at our No. 828.

[34] See the complaint attached to the record of the proceedings before Young Wa, acting District Magistrate of the District of Lanai "On the Preliminary Hearing had by the Plaintiffs Agliam and Others * * *", admitted pursuant to the stipulation at No. 828, paragraph 7 (item 5) and paragraphs 8 and 9. We refer to this transcript as the "Lanai transcript".

[35] The District Court on occasion is a committing magistrate's court wherein defendants may be held for the Circuit Court. See Sections 9671–9688, Revised Laws of Hawaii 1945. The Circuit Court is the nisi prius or trial court which must sit with a jury in criminal cases unless a jury be waived. See Sections 9631–9657 and Section 10825, Revised Laws of Hawaii 1945.

[36] See Lanai transcript, 8/6/47, p. 1.

[37] Lanai transcript, 8/28/47, p. 126.

Assistant Chief of Police Freitas testified on cross-examination in this court that a number of pictures were taken at the harbor both before and after the incident as well as during it. He was asked, "Isn't it true that a large number of pictures were taken after everything was pau [finished]"? He replied, "Yes, there were pictures taken afterwards." We find it to be a fact that a number of persons came to the scene presumably out of curiosity after the incident was over. Freitas testified that "all these pictures" were used in compiling the list of names in the complaint sworn to by him before the magistrate. One individual, Aki, was present during the incident but took no part in it. He was arrested nonetheless. He was not a member of the ILWU at the time. A police officer, Lieutenant Madeiros, told Aki that he was surprised that he was arrested at all as he was not a union man. Aki was quickly discharged from custody.

It will be observed that sixty-three persons were subjected to criminal process by reason of the Lanai incident and that only forty-seven of them were finally held for action of a grand jury. Again the law enforcement officers of Maui County threw a very wide net.[38] The Deputy County Attorney for Maui County as before instructed Freitas to cause the complaints to charge violations of the unlawful assembly and riot act.

Barbosa and the others named in the complaint, Exhibit D attached to the complaint at our No. 828, filed certain motions and challenges to the 1947 Maui County grand jury.[39] This matter must be referred to again at a later point in this opinion.

### The Kalua Incident at Lanai City.

The second incident on the Island of Lanai[40] occurred early in the morning of July 15, 1947. Its victims were Jacob Kalua Nahinu and Sam Kalua.[41] Both roomed in House No. 7 in Block 33, Lanai City, and were truck drivers employed by the Hawaiian Pineapple Company. Neither had gone out on strike. Shortly after 5:30 A. M. twenty to twenty-five persons, most of whom must be assumed to have been strikers since they were headed by "union police" with arm bands, proceeded to administer a severe beating to Jacob and when his brother, Sam, attempted to rescue him, he too was beaten.[42] Jacob was caught between the house and the communal washroom. The Kalua brothers were able to identify only five persons who were arrested on a complaint made the same day. The persons arrested were Abraham Makekau[43] and four others. They were committed to await action of the grand jury. This complaint[44] also was based upon the unlawful assembly and riot act. The prosecution of Makekau and his co-defendants has not been proceeded with by reason of the restraint issued by this court at No. 828.

Makekau and his co-defendants joined with Barbosa and his co-defendants in filing the motions and challenges to the 1947

---

[38] As to persons wrongfully arrested the case of Shigeto Minami may perhaps be deemed to be typical. Minami, who was working for the research department of the Hawaiian Pineapple Company, and was not a member of the union, albeit he ceased work on July 10, 1947 when the union men struck, went to Kaumalapau Harbor from Lanai City to go swimming with some friends on the day of the incident, remaining there only until about 1 o'clock in the afternoon, leaving about three hours before the incident started. He seems to have been photographed by the police, was subsequently arrested under the complaint alleging unlawful assembly and riot and was compelled to make bail in the amount of $100. After approximately five appearances before a magistrate he was discharged.

[39] See par 10, stipulation, 4/23/48, at our No. 828.

[40] The Island of Lanai lies off the larger Island of Maui and, as already stated, is included in Maui County.

[41] These two men are brothers albeit they possess different surnames. They will be referred to from time to time in this opinion as the "Kalua brothers".

[42] See the pictures taken of Jacob following the beating. Defendants' Exhibit I, 1 and 2.

[43] See Makekau's statement made before Assistant Chief of Police Freitas on July 15, 1947, Defendants' Exhibit N.

[44] Attached to the amendments to the challenges and motions to the Maui County grand jury, as Exhibit G at our No. 828.

Maui County grand jury as mentioned in the last paragraph of the preceding sub-heading.

### Incidents Occurring in and About the City and County of Honolulu During the Pineapple Workers' Strike.

There was testimony that one Sibolboro and seven others were arrested for obstructing a highway in the City and County of Honolulu on July 13, 1947. Sibolboro lay down in front of a truck, preventing it from proceeding on the highway. He was sentenced to six months imprisonment but sentence was suspended. Eighty-three other persons were also arrested as the result of another incident in the County of Honolulu on the same Sunday and charged with obstructing a highway at Turner's Switch. These charges were later nolle prossed.[45]

### Excessive Bail.

■ In numerous instances the bail required of the defendants, plaintiffs herein, in criminal proceedings growing out of the strikes, seems to us to have been so large as to be excessive. Pedro De La Cruz testified that he was president of Local 152 and had the duty of making bail with union funds for union members charged with the violations of law hereinbefore referred to in this opinion. He testified that Makekau and the four others arrested with him and charged with unlawful assembly and riot were required to make bail in the amount of $1,000 apiece;[46] that Diego Barbosa and one of the ten other persons arrested with him for violation of the unlawful assembly and riot act were required to give bail in the amount of $1,000 apiece; three of them were granted bail in the amount of $500 apiece; and the remaining defendants were granted bail in the amount of $250 apiece.[47] It should be noted that Shigeto Minami, who had nothing to do with the Kamaulapau Harbor incident, save his appearance at the scene perhaps three hours before the incident occurred, was held in bail of $100, though released after subsequent hearings.[48]

Even in the Makekau case, growing out of the assaults on the brothers Kalua, bail set in the amount of $1,000 a defendant seems too high. The requirement of bail in such an amount for an assault and battery would seem to be unusual even on the eastern and western seaboards of the United States. There is but little chance for a defendant under bail to escape from the Territory of Hawaii or even from Maui County by reason of geographical isolation.

### The Use of the Unlawful Assembly and Riot Statute.

It will be observed that the unlawful assembly and riot statute has been extensively, and indeed almost continuously, invoked by the law enforcement officers of Maui County against members of the ILWU during the course of the sugar and pineapple strikes; indeed, on occasions and under circumstances, for example those in connection with the Kalua brothers and the Yamauchi incidents, when the invocation of the statute seems inappropriate. The record demonstrates a leaning on the part of the law enforcement authorities of Maui County toward the use of the unlawful assembly and riot act when a statute like the assault and battery act, Chapter 239, Sections 11050–11060, Revised Laws of Hawaii 1945, would, we think, have been employed if the motive for prosecution had been only the maintenance of good order in the community and the punishment of minor law breakers. Certainly, the penalty provisions of Chapter 239 must be deemed to be adequate for those purposes.

Wendell F. Crockett, Esquire, the Deputy County Attorney of Maui County and a defendant at both Nos. 828 and 836, testified before this court. We found him to be a most credible and intelligent witness. He was asked[49] by the attorney for the plaintiffs, "In your experience of thirty years as deputy county attorney for the County of Maui, have you ever prosecuted any person for unlawful assembly and riot except as it

---

[45] The defendants objected to the testimony referred to under this heading and, after it was presented, moved to strike it out. We will deny the motion to strike since we deem the evidence to be pertinent.

[46] See transcript before this court at p. 138.

[47] Id. pp. 139-140, 145-146.

[48] Id. at p. 52. See note 38, supra.

[49] Transcript at pp. 282-3.

grew out of a labor dispute?" He replied: "To my recollection except for the present cases, there was only one case prosecuted in the County of Maui for unlawful assembly, and that grew out of an alleged kidnapping that took place during a labor dispute." We have found but one reported case in which the unlawful assembly and riot act was invoked in a case which did not involve a labor dispute. This is Republic of Hawaii v. Carvalho, 10 Haw. 446, which involved a riot among Portuguese members of the island community. This case, as indicated, was prior to annexation and occurred during the life of the Republic of Hawaii.

No evidence was offered by the defendants to rebut Mr. Crockett's testimony on this very important point. Since one of the major issues in the instant cases is the good faith of the prosecutions instituted against the individual plaintiffs by the Territory under the unlawful assembly and riot act, had rebutting testimony been available, assuredly it would have been brought forward by the able attorneys for the defendants; evidence, not only as to the unlawful assembly and riot act being employed against groups other than labor groups in Maui County but in any other part of the Territory of Hawaii as well. In the absence of such rebutting testimony we are entitled to find and we do find, that the unlawful assembly and riot act has been employed by the Territory only against labor groups in labor disputes, at least for the last three decades.

Mr. Crockett testified also that he would proceed with the prosecutions of the plaintiffs as soon as circumstances would enable him to do so.

The Law, Save that Relating to the Motions and Challenges to the Jury Commissioners and Grand Juries of Maui County.

The challenges to the grand jury commissioners and to the grand juries of Maui County, as we have said, will be treated under a later heading since these subjects are separated to a considerable degree from the facts and the law relating to the incidents hereinbefore referred to and to the unlawful assembly and riot act and the conspiracy statute of the Territory. We will deal first with our authority to sit as a three-judge court pursuant to the authority of revised Title 28, and then with the attacks on the constitutionality of the two territorial statutes last referred to.

As to Our Authority to Sit as a Court of Three Judges Under Section 2281 of Revised Title 28 U.S.C.A., or as a Court of Three Judges Sitting En Banc.

We state in limine that we are of the opinion that the provisions of revised Title 28 U.S.C.A., effective September 1, 1948, are applicable in the cases at bar. See Section 38 of the Act of June 25, 1948, c. 646, 62 Stat. 992, Section 1 of which enacted revised Title 28. While it is true that the provisions of the revised Title were not in effect at the time the suits at bar were filed or when they were heard, we deem this fact to be immaterial. It is important only that the provisions of revised Title 28 are in force at the time of our decision. We have functioned as a three-judge revised Title 28, Section 2281 court in adjudicating the issues presented by the pleadings and the evidence in the instant cases. Congress by enactment of revised Title 28 saw fit to change the status of the United States District Court for Hawaii while the present litigations were pending by enacting revised Title 28, Sections 451, 133 and 134(a). The parties, however, cannot complain respecting the new enactment which changed the status of this court since they do not suffer " * * * loss of rights, interruption of jurisdiction, or prejudice * * * " in the pending matters. See Section 2(b) of the Act of June 25, 1948, c. 646, 62 Stat. 985.

The parties in fact do not make any complaint respecting the changed status of this court, though their arguments, both written and oral, in large part have been based upon the provisions of the Judicial Code of 1911. We can function only pursuant to the powers conferred upon us by Congress and therefore we must decide the pending cases under the provisions of revised Title 28 if we are to make the decisions. A helpful analogy is supplied, we think, by those authorities which hold that procedural amendments are to be applied to pending

cases. See Schoen v. Mountain Producers Corporation, 3 Cir., 170 F.2d 707; McCullough v. Virginia, 172 U.S. 102, 19 S.Ct. 134, 43 L.Ed. 382; State of Pennsylvania v. Wheeling & Belmont Bridge Co., 18 How. 421, 59 U.S. 421, 15 L.Ed. 435, and Hodges v. Snyder, 261 U.S. 600, 43 S.Ct. 435, 67 L.Ed. 819. Cf. Hallowell v. Commons, 239 U.S. 506, 36 S.Ct. 202, 60 L.Ed. 409; Baltimore & P. Railroad Co. v. Grant, 98 U.S. 398, 401, 402, 25 L.Ed. 231; Federal Reserve Bank of Richmond v. Kalin, 4 Cir., 77 F.2d 50, 51, 52; and Link v. Receivers of Seaboard Air Line Ry. Co., 4 Cir., 73 F.2d 149, 151. We can find no authority strictly in point.

The critical language of Section 2281 of revised Title 28,[50] states that no interlocutory injunction or final order restraining the enforcement "of any State statute" by "any officer of such State" shall be granted except "by a district court of three judges" as provided by Section 2284. Cf. the provisions of Section 266 of the old Judicial

[50] As follows: "Section 2281. An interlocutory or permanent injunction restraining the enforcement, operation or execution of any State statute by restraining the action of any officer of such State in the enforcement or execution of such statute or of an order made by an administrative board or commission acting under State statutes, shall not be granted by any district court or judge thereof upon the ground of the unconstitutionality of such statute unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title."

See also Section 2283 as follows: "A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgment."

See also Section 2284 as follows: "In any action or proceeding required by Act of Congress to be heard and determined by a district court of three judges the composition and procedure of the court, except as otherwise provided by law, shall be as follows:

"(1) The district judge to whom the application for injunction or other relief is presented shall constitute one member of such court. On the filing of the application, he shall immediately notify the chief judge of the circuit, who shall designate two other judges, at least one of whom shall be a circuit judge. Such judges shall serve as members of the court to hear and determine the action or proceeding.

"(2) If the action involves the enforcement, operation or execution of State statutes or State administrative orders, at least five days notice of the hearing shall be given to the governor and attorney general of the State.

"If the action involves the enforcement, operation or execution of an Act of Congress or an order of any department or agency of the United States, at least five days' notice of the hearing shall be given to the Attorney General of the United States, to the United States attorney for the district, and to such other persons as may be defendants.

"Such notice shall be given by registered mail by the clerk, and shall be complete on the mailing thereof.

"(3) In any such case in which an application for an interlocutory injunction is made, the district judge to whom the application is made may, at any time, grant a temporary restraining order to prevent irreparable damage. The order, unless previously revoked by the district judge, shall remain in force only until the hearing and determination by the full court. It shall contain a specific finding, based upon evidence submitted to such judge and identified by reference thereto, that specified irreparable damage will result if the order is not granted.

"(4) In any such case the application shall be given precedence and assigned for a hearing at the earliest practicable day. Two judges must concur in granting the application.

"(5) Any one of the three judges of the court may perform all functions, conduct all proceedings except the trial, and enter all orders required or permitted by the rules of civil procedure. A single judge shall not appoint a master or order a reference, or hear and determine any application for an interlocutory injunction or motion to vacate the same, or dismiss the action, or enter a summary or final judgment. The action of a single judge shall be reviewable by the full court at any time before final hearing.

"A district court of three judges shall, before final hearing, stay any action pending therein to enjoin, suspend or retrain the enforcement or execution of a State statute or order thereunder, whenever it appears that a State court of competent jurisdiction has stayed proceedings under such statute or order pending the determination in such State court of an action to enforce the same. If the action in the State court is not

Code.[51] It will be observed therefore that there are two barriers which must be cleared before the jurisdiction of this court, sitting as a three judge Section 2281 tribunal, becomes plain. The first is in the use of the word "State" in Section 2281 and in Sections 2283 and 2284. May it be said that the unlawful assembly and riot act and the conspiracy statute of the Territory of Hawaii are statutes of a "State"[52] or "State statutes" within the purview of the sections? The second barrier lies in the nature of the United States District Court for the District of Hawaii. Is it "a district court" within the applicable language of the statute?

We will discuss the second question first and are aided in determining it by additional pertinent sections of revised Title 28. Section 451 provides, "As used in this title: The term 'court of the United States' includes the Supreme Court of the United States, * * * [and] district courts constituted by chapter 5 of this title, including the district courts of the United States for the districts of Hawaii and Puerto Rico

---

prosecuted diligently and in good faith, the district court of three judges may vacate its stay after hearing upon ten days notice served upon the attorney general of the State."

[51] As follows: "No interlocutory injunction suspending or restraining the enforcement, operation, or execution of any statute of a State by restraining the action of any officer of such State in the enforcement or execution of such statute, or in the enforcement or execution of an order made by an administrative board or commission acting under and pursuant to the statutes of such State, shall be issued or granted by any justice of the Supreme Court, or by any district court of the United States, or by any judge thereof, or by any circuit judge acting as district judge, upon the ground of the unconstitutionality of such statute, unless the application for the same shall be presented to a justice of the Supreme Court of the United States, or to a circuit or district judge, and shall be heard and determined by three judges, of whom at least one shall be a justice of the Supreme Court or a circuit judge, and the other two may be either circuit or district judges, and unless a majority of said three judges shall concur in granting such application. Whenever such application as aforesaid is presented to a justice of the Supreme Court, or to a judge, he shall immediately call to his assistance to hear and determine the application two other judges: Provided, however, That one of such three judges shall be a justice of the Supreme Court, or a circuit judge. Said application shall not be heard or determined before at least five days' notice of the hearing has been given to the governor and to the attorney general of the State, and to such other persons as may be defendants in the suit: Provided, That if of opinion that irreparable loss or damage would result to the complainant unless a temporary restraining order is granted, any justice of the Supreme Court, or any circuit or district judge, may grant such

temporary restraining order at any time before such hearing and determination of the application for an interlocutory injunction, but such temporary restraining order shall remain in force only until the hearing and determination of the application for an interlocutory injunction upon notice as aforesaid. The hearing upon such application for an interlocutory injunction shall be given precedence and shall be in every way expedited and be assigned for a hearing at the earliest practicable day after the expiration of the notice hereinbefore provided for. An appeal may be taken direct to the Supreme Court of the United States from the order granting or denying, after notice and hearing, an interlocutory injunction in such case. It is further provided that if before the final hearing of such application a suit shall have been brought in a court of the State having jurisdiction thereof under the laws of such State, to enforce such statute or order, accompanied by a stay in such State court of proceedings under such statute or order pending the determination of such suit by such State court, all proceedings in any court of the United States to restrain the execution of such statute or order shall be stayed pending the final determination of such suit in the courts of the State. Such stay may be vacated upon proof made after hearing, and notice of ten days served upon the attorney general of the State, that the suit in the State courts is not being prosecuted with diligence and good faith. The requirement respecting the presence of three judges shall also apply to the final hearing in such suit in the district court; and a direct appeal to the Supreme Court may be taken from a final decree granting or denying a permanent injunction in such suit."

[52] See the position taken in respect to this word in the dissenting opinion of Chief Judge Denman in Mo Hock Ke Lok Po v. Stainback, D.C., 74 F.Supp. 852, at page 861 et seq.

* * * " ; "The terms 'district court' and 'district court of the United States' mean the courts constituted by chapter 5 of this title" ; and "The term 'district' and 'judicial district' mean the districts enumerated in Chapter 5 of this title." Turning to Chapter 5, Section 91, we find that the statute provides, "Hawaii constitutes one judicial district which includes the Midway Islands, Wake Island * * *". Section 132 provides for the creation and composition of district courts and states, inter alia, that "There shall be in each judicial district a district court which shall be a court of record known as the United States District Court for the district." See subparagraph (a). Section 133 states that "The President shall appoint, by and with the advice and consent of the Senate, district judges for the several judicial districts, as follows: * * * Hawaii * * * 2 * * * [and that only] citizens of the Territory of Hawaii who have resided therein for at least three years next preceding shall be eligible for appointment as district judges for the district of Hawaii." Section 134 (a) provides that "The district judges, except in Hawaii and Puerto Rico, shall hold office during good behavior. The district judges in Hawaii and Puerto Rico shall hold office for terms of six and eight years, respectively, and until their successors are appointed and qualified."

 In view of the foregoing, whatever may have been the status of the district Court for Hawaii prior to September 1, 1948, the effective date of revised Title 28, there can be no doubt that the court is now a "district court of the United States" in all respects pertinent to the instant question and for the application of Sections 2281, 2283 and 2284. Cf. Mookini v. United States, 303 U.S. 201, 205, 58 S.Ct. 543, 82 L.Ed. 748; Ex parte Collins, 277 U.S. 565, 567, 48 S.Ct. 585, 72 L.Ed. 990, and Phillips v. United States, 312 U.S. 246, 248–254, 61 S.Ct. 480, 85 L.Ed. 800. Congress has seen fit to cover, coordinate and integrate the District Courts for Hawaii and Puerto Rico into the federal court system as far as this can be done without constitutional amendment. True, these district courts remain legislative tribunals created by Congress in the exercise of its "sovereign congressional faculty" under Article IV, Section 3 of the Constitution of the United States instead of "true United States court" authorized by Article III. See Balzac v. Porto Rico, 258 U.S. 298, 312, 42 S. Ct. 343, 348, 66 L.Ed. 627. No constitutional provision limits the coordination and integration here conceived of and made operable by Congress. The District Court for Hawaii therefore must be held to be a "district court" within the purview of the sections of revised Title 28 referred to.

The second question, i. e., the effect to be attributed to the use of the word "State", remains for disposition, however. It is indeed a difficult one. There is no doubt that in organizing the Territory of Hawaii Congress saw fit to give to the local government broad domestic powers separating its operations from those of the federal government within the Territory, and that it bestowed upon the Territory a form of organization more like that of a State than had previously been given to any other area.[53] See Alesna v. Rice, D. C. Haw., 69 F.Supp. 897, 899, citing People of Puerto

---

[53] See Defendants' Exhibit Q, the Message from the President, transmitting the Report of the Hawaiian Commission, 55th Cong. 3rd Sess. Senate Document No. 16, p. 162, "Report of the Committee on Judiciary", wherein it is stated in part, "Hawaii having been hitherto a single independent State, its courts have exercised much of the jurisdiction exercised by both the Federal and State courts in this country. In this respect the Hawaiian courts have resembled somewhat the courts of the Territories of the United States, which, as a rule, have had much Federal jurisdiction, as well as jurisdiction of cases arising under the Territorial laws. It seems very desirable in the case of Hawaii to separate these jurisdictions, leaving all cases arising under the laws of the Territory to Territorial courts and transferring all jurisdiction of a Federal nature to a district court of the United States to be established for the Territory of Hawaii. This district court should have also the jurisdiction of a circuit court of the United States.

"There are many reasons which make this separation of jurisdictions desirable. The foreign shipping already calling at the ports of Hawaii, as well as the shipping from the United States is very ex-

Rico v. Shell Co., 302 U.S. 253, 58 S.Ct. 167, 82 L.Ed. 235. See also Alesna v. Rice, D.C., 74 F.Supp. 865. It is also clear that Congress recognized the distinction between the territorial courts and the United States District Court for the Territory of Hawaii. See Section 86 of the Organic Act, as amended [54] by Section 8 of the Act of June 25, 1948, c. 646. As early as 1901 the Court of Appeals for the Ninth Circuit in Wilder's S. S. Co. v. Hind, 108 F. 113, 116, perceived that distinction, stating, "The system of courts created by the [Organic] act for the territory of Hawaii differs radically from the system of courts which congress had theretofore created for any of the territories. In no other territory has there been a division of jurisdiction between cases which properly belong to courts of the United States and other cases. Congress found in the republic of Hawaii a system of courts already established, whose jurisdiction was complete, and from the highest tribunal of which there was no appeal. To that system congress, by the act, added a district court, conferring upon it

the jurisdiction which pertains to the district and circuit courts of the United States, and providing for removing to that court from the territorial courts causes which under the removal acts were removable from a state court to a court of the United States." See also Ex parte Wilder's Steamship Company, 183 U.S. 545, 22 S. Ct. 225, 46 L.Ed. 321. It is interesting to note that the general principle established by Wilder's case was early made applicable to *habeas corpus* proceedings in the District Court of the Territory by a series of cases holding that the federal rule against interference with criminal proceedings in the Territorial Courts might prevent the issuance of the writ except in cases of peculiar urgency. See In the matter of Marshall, 1 D.C.Haw. 34, 37–42; In the matter of Atcherley, 3 D.C.Haw. 404; Soga v. Jarrett, 3 D.C.Haw. 502, 504; In re Curran, 4 D.C.Haw, 730, 738.

The language of Section 86 of the Organic Act as amended by Section 8 of the Act of June 25, 1948, c. 646, provides that, *"The laws of the United States relating to*

---

tensive and is rapidly increasing. With the natural growth of commerce on the Pacific, and especially in view of the change in the ownership of the Philippines, the near completion of the Siberian Railway, and the projected Nicaraguan Canal, the shipping that will call at the Hawaiian Islands will undoubtedly increase more rapidly in the future than it has increased in the past. This will give rise to many important admiralty cases in Hawaii, some of which may become matters of international interest.

"It is obviously very desirable that jurisdiction over such cases should be exercised by Federal judges. Again, in the event of war, Hawaii may become a center for the trial of prize cases, of which the Federal courts should have exclusive jurisdiction. *By making the relations between the territorial courts of Hawaii and the Federal courts, as to appeals, removal of causes, etc., the same as the corresponding relations between the State and Federal courts, all cases of a local nature can be tried and determined finally in the islands, and thus the expense and delay of bringing such cases to the mainland, and possibly to Washington, a distance of 5,000 miles, will be avoided.* (Emphasis added.)

"Very little change need be made in the organization of the territorial or local judiciary. The organization and

procedure of the Hawaiian courts is already very similar to what is found in the United States. This has been the result of a growth of sixty years of constitutional government in Hawaii under American influences. The judiciary department, unlike the executive and legislative departments, has always been free from politics. The people of Hawaii have great confidence in their judiciary and have always looked to it as the one impregnable bulwark of their liberties. The last two sovereigns under the monarchy, who did so much to lower the standard of the executive and legislative departments, did not dare to encroach materially upon the judiciary department until the final attempt of the Queen, which resulted in the loss of her throne."

[54] To read as follows: "The laws of the United States relating to removal of causes, appeals and other matters and proceedings as between the courts of the United States and the courts of the several States shall govern in such matters and proceedings as between the courts of the United States and the courts of the Territory of Hawaii." 48 U.S.C.A. § 645.

The language quoted is in all pertinent respects identical with that which has always been included in Section 86 of the Organic Act. See 31 Stat. 158.

removal of causes, appeals and other *matters and proceedings as between the courts of the United States and the courts of the several States shall govern in such matters and proceedings as between the courts of the United States and the courts of the Territory of Hawaii*",[55] seems to support the conclusion that a statute of Hawaii was intended by Congress to be treated as if it were a statute of a State. True, "removal of causes" is included in Section 86 and it is on this phraseology that the decision of the Court of Appeals for the Ninth Circuit in Yeung v. Territory of Hawaii, 132 F.2d 374, can be bottomed. But the last phrase of Section 86, "other matters and proceedings", is as powerfully inclusive as if the word "all" had been expressly inserted before the word "other". If the laws of the United States are to govern in all matters, both procedural and jurisdictional, it surely was the intent of Congress to treat the United States District Court for Hawaii as if, procedurally and jurisdictionally, though within the framework of the Constitution, it were in fact a district Court of the United States, and also to treat the Territory of Hawaii insofar as its relations to that court are concerned as if it were in fact a State of the United States. If this be so it would follow that a statute passed by the Legislature of the Territory of Hawaii is to be tried and tested by a three-judge Section 2281 court as if it were in fact a statute enacted by a State of the United States.

The Territory of Hawaii, like the Territory of Alaska, and perhaps in contradistinction to Puerto Rico, is a fully "organized" territory. Puerto Rico may possibly still retain a lingering status of a "possession" or quasi territory though this is to be doubted. See Balzac v. Porto Rico, supra, 258 U.S. at page 309, 42 S.Ct. 343, 66 L.Ed. 627. Cf. Rassmussen v. United States, 197 U.S. 516, 25 S.Ct. 514, 49 L.Ed. 862. See also Dorr v. United States, 195 U.S. 138, 148, 248 S.Ct. 808, 49 L.Ed. 128, 1 Ann.Cas. 697, and Downes v. Bidwell, 182 U.S. 244, 305, 21 S.Ct. 770, 45 L.Ed. 1088, the concurring opinion of Mr. Justice White. See the provisions of the Organic Act of Puerto Rico, 48 U.S.C.A. § 731 et seq. Section 35 of the Organic Act of

Puerto Rico as it stood prior to the amendment effected by Section 21 of the Act of June 25, 1948, c. 646, 48 U.S.C.A. § 864, was comparable to Section 86 of the Organic Act of Hawaii as it is now and as it was prior to amendment. We can find no valid basis of distinction between the decision of this court in the Mo Hock Ke Lok Po v. Stainback, 74 F.Supp. 852, and that of the Court of Appeals for the First Circuit in Benedicto v. West India & Panama Telegraph Co., 256 F. 417, 418, 419. But see Munoz v. Porto Rico Ry. Light & Power Co., 1 Cir., 83 F.2d 262, 264–267. Cf. Sancho v. Bacardi Corporation of America, 1 Cir., 109 F.2d 57, modified and affirmed in part and reversed in part in Bacardi Corp. of America v. Domenech, 311 U.S. 150, 167, 61 S.Ct 219, 85 L.Ed. 98. See also Territory of Alaska v. Troy, 258 U.S. 101, 42 S. Ct. 241, 66 L.Ed. 487, and Dooley v. United States, 183 U.S. 151, 22 S.Ct. 62, 46 L.Ed. 128. There is of course high authority for construing the word "territory" employed in a statute under some circumstances as if it were in fact the word "State". See the very recent decision of the Supreme Court in Andres v. United States, 333 U.S. 740, 745, 68 S.Ct. 880. See for example United States v. Bevans, 3 Wheat. 336, 385, 4 L. Ed. 404; Talbott v. Board of Com'rs Silver Bow County, 139 U.S. 438, 444, 11 S.Ct. 594, 35 L.Ed. 210, and Wynne v. United States, 217 U.S. 234, 30 S.Ct. 447, 54 L.Ed. 748. Cf. Alesna v. Rice, supra, and Hall v. Hawaiian Pineapple Co., D.C.Haw., 72 F.Supp. 533, and of course, the Mo Hock Ke Lok Po decision itself. Compare the recent decision of the Court of Appeals for the Ninth Circuit in International Longshoremen's Union v. Wirtz,* supra, affirming the decision of the Supreme Court of Hawaii in International Longshoremen's and Warehousemen's Union et al. v. Wirtz et al., 37 Haw. 404.

Much of course can be said upon the other side. We find three cases exceedingly troublesome; Phillips v. United States, supra, Mookini v. United States, supra, and Ex parte Collins, supra. The first decision, which is relied on strongly in Chief Judge Denman's dissenting opinion in the Mo Hock Ke Lok Po case points out that Sec-

---

55 Emphasis added. See note 54, *supra.* * See 170 F.2d 183.

tion 266 of the old Judicial Code was not [74 F.Supp. 861] "a measure of broad social policy to be construed with great liberality, but as an enactment technical in the strict sense of the term and to be applied as such." 312 U.S. at page 251, 61 S.Ct. at page 483, 85 L.Ed. 800. Mr. Justice Frankfurter then went on to say, "To bring this procedural device into play—to dislocate the normal operations of the system of lower federal courts and thereafter to come directly to this Court—requires a suit which seeks to interpose the Constitution against enforcement of a state policy, whether such policy is defined in a state constitution or in an ordinary statute or through the delegated legislation of an 'administrative board or commission'. The crux of the business is procedural protection against an improvident state-wide doom by a federal court of a state's legislative policy. This was the aim of Congress and this is the reconciling principle of the cases."

In the Mookini case the Supreme Court, by Mr. Chief Justice Hughes, decided that the provisions of Section 86 of the Organic Act of Hawaii, as it existed prior to the recent amendment, was not decisive in requiring the Criminal Appeals Rules prescribed by the Supreme Court for district courts of the United States to be applied in the District Court of Hawaii. See 303 U.S. at page 205, 58 S.Ct. 543, 82 L.Ed. 748. This decision must now be read in the light of the provisions of revised Title 28. As we have demonstrated Congress has seen fit to obliterate procedural and jurisdictional distinctions between the two types of courts bestowing on the District Court of Hawaii insofar as Congress could by legislation the jurisdiction of a constitutional court. Congress had looked in this direction for some time having provided by Section 86 of the Organic Act, 48 U.S.C.A. § 642, prior to the recent amendment, that the District Court of Hawaii " * * * shall have the jurisdiction of district courts of the United States, and shall proceed * * * in the same manner as a district court * * *."

In Ex parte Collins, supra, the Supreme Court, by Mr. Justice Brandeis, pointing out that the provisions of Section 266 were intended to restrain the enforcement [277 U.S. 565, 48 S.Ct. 586] "of a statute of a state", said that it "was intended to embrace a limited class of cases of special importance and requiring special treatment in the interest of the public." In footnote 1, 277 U.S. at page 567, 48 S.Ct. at page 586, 72 L.Ed. 990, Mr. Justice Brandeis pointed out that the amendment to the Commerce Act, which later became Section 266, " * * * evidently recognizes the superior degree of consideration and sanction which should be given to a state statute, and [Section 266] prevents hasty interference with the action of a sovereign state", citing 45 Cong. Rec. 7253. See also 277 U.S. at pages 567–569, 48 S.Ct. 585, 72 L.Ed. 990. It is true that as used in the Constitution of the United States the word "state" has been held to mean "state" as a member of the Union. See Hepburn & Dundas v. Ellzey, 2 Cranch 445, 451, 2 L.Ed. 332; Corporation of New Orleans v. Winter, 1 Wheat. 91, 94, 4 L.Ed. 44, and Hooe v. Jamieson, 166 U.S. 395, 17 S.Ct. 596, 41 L.Ed. 1049. Cf. Enes v. Hoopai, Chief of Police, 38 Haw. 126, 134–140.

The matter is further complicated by various appeal provisions. As we have pointed out, Section 86 of the Organic Act, see note 54, supra, requires that appeals from the District Court for Hawaii should be had and allowed to the Court of Appeals for the Ninth Circuit in the same manner as from district courts to the respective courts of appeals as provided by law. A proceeding under Section 2281 of revised Title 28, like one under Section 266 of the old Judicial Code, affords a direct appeal to the Supreme Court of the United States. See Section 1253 of revised Title 28 providing for direct appeal to the Supreme Court from decisions of a three-judge court. But see also Section 1294 of revised Title 28 which provides for appeals from decisions of the district and territorial courts to the various courts of appeals. Section 128 of the old Judicial Code had ordained that the circuit courts of appeals should have jurisdiction to review by appeal final decisions in the United States District Courts for Hawaii and for Puerto Rico in all cases. This distinction had come into the law by the Act of February 13, 1925, 43 Stat. 936. Section 13 of that Act provided expressly

for the repeal of "So much of the Hawaiian Organic Act as amended by the Act of July 9, 1921, as permits a direct review by the Supreme Court of cases in the courts in Hawaii." The Act of July 9, 1921, 42 Stat. 108, 120, had reiterated the pertinent portions of an Act of March 3, 1909, 35 Stat. 838, which amended Section 86 of the Organic Act by permitting appeals and writs of error to be taken to the Supreme Court of the United States from the District Court for Hawaii " * * * in cases where appeals and writs of error are allowed from the district and circuit courts of the United States to the Supreme Court * * *."

But Sections 1253 and 1294 of revised Title 28 seemingly have broadened the base for appeal to the Supreme Court. Section 1253 provides: "Except as otherwise provided by law, any party may appeal to the Supreme Court from an order granting or denying, after notice and hearing, an interlocutory or permanent injunction in any civil action, suit or proceeding required by any Act of Congress 'to be heard and determined by a district court of three judges." Section 1294, which must be read in connection with Section 1253, provides, insofar as is pertinent here, that "Appeals from reviewable decisions of the district and territorial courts shall be taken to the courts of appeals as follows: (1) From a district court of the United States to the court of appeals for the circuit embracing the district". As we have seen the District Court for the District of Hawaii has been integrated into the federal judicial system and has been made a district court of the United States insofar as that may be permissible under constitutional limitations. It remains a legislative and not a constitutional court but the procedure of appeal from its decisions is without any constitutional barrier. It follows, therefore, that appeals from the District Court for Hawaii go to the Court of Appeals for the Ninth Circuit except in those cases referred to in Section 1253 which permit direct appeal to the Supreme Court

of the United States, viz., appeals from decisions of district courts of three judges. All other appeal procedures are wiped out and obliterated by the new Judicial Code which has amended Section 86 of the Organic Act. It would seem to have been the intention of Congress to authorize appeals from three-judge decisions of the District Court for Hawaii direct to the Supreme Court of the United States.

We conclude on consideration of all the foregoing that it was the intention of Congress by the enactment of the provisions of revised Title 28 referred to to award to statutes of Hawaii and to the United States District Court for the District of Hawaii status whereby the provisions of Section 2281 must be employed to test the constitutionality of territorial acts.

If, however, we are wrong in our conclusion that we are a properly constituted three-judge court qualified by the provisions of Section 2281 to hear and adjudicate the validity of the statutes involved in the instant cases, we think that we are authorized to do so as the United States District Court for the District of Hawaii comprised of three judges qualified to sit therein and sitting en banc. As we stated in Reinecke v. Loper, D.C.Haw., 77 F.Supp. 333, in note 2 cited to the text, the present writer was designated to sit in the Court of Appeals for the Ninth Circuit by Mr. Chief Justice Vinson pursuant to Section 13 [56] of the old Judicial Code. Thereafter, he was designated by Senior United States Circuit Judge Francis A. Garrecht of the Ninth Circuit to serve temporarily in the District Court of the United States for the District of Hawaii pursuant to Section 14 [57] of the former Judicial Code. This section provided: "Each district judge designated and assigned under the provisions of section 17 of this chapter may hold separately and at the same time a district court *in the district or territory* to which such judge is designated and assigned and discharge all the judicial duties of the district or territorial judge therein.[58] Each circuit judge designated and assigned to serve temporari-

---

[56] See and compare Section 291 of revised Title 28.

[57] 42 Stat. 839, 56 Stat. 1094. See and compare Section 291 of revised Title 28

and in particular subparagraph (c). Compare also Section 292 of revised Title 28.

[58] Emphasis added.

ly as a circuit judge in another circuit may and shall, during the period of his assignment, exercise all the judicial powers and discharge and perform all the judicial duties of and be subject to the same assignments of duties as the circuit judges of the circuit to which he is designated and assigned for temporary duty." See also Sections 15, 17 and 18 of the old Judicial Code and Sections 291, 292, 295 and 296, constituting Chapter 13 of revised Title 28, under which we render our present decisions. It should be pointed out that the substance of the pertinent provisions of revised Title 28 is identical with that of the former statutes referred to. It follows, therefore, that the present writer by virtue of the two assignments and designations referred to is qualified to sit in and to determine the cases at bar as a judge sitting in the District Court for the District of Hawaii.

▮▮▮ Judge George B. Harris, a District Judge for the Northern District of California, was also assigned and designated to sit in the District Court for the District of Hawaii by Senior United States Circuit Judge Garrecht pursuant to the provisions of Sections 13 and 14 of the former Judicial Code and sits and determines the instant cases pursuant to the provisions of revised Title 28 referred to in the previous paragraph. Chief Judge Delbert E. Metzger was the Senior United States District Judge of the District Court for the District of Hawaii at the time the instant cases were heard.[59] All three judges, therefore, were and are qualified to sit in the instant cases and dispose of them as a court of the District Court of the District of Hawaii sitting en banc. In conclusion it should be pointed out that our decisions are unanimous. See Public Service Commission v. Brashear Freight Lines, 312 U.S. 621, 626, 61 S.Ct. 784, 85 L.Ed. 1083.

### The General Jurisdiction of the Court.

In the decision of this court in Mo Hock Ke Lok Po v. Stainback, supra, 74 F.Supp. at page 853, it was said: "The court sua sponte notes that the jurisdictional amount of § 41(1) is required of all civil suits litigating constitutional questions except those stated in the succeeding 27 paragraphs [of Section 41]. No one of these gives the district courts jurisdiction of a deprivation of a right created by *territorial* law, though paragraph (14) gives such jurisdiction to such a deprivation by a state law. * * * It thus seems that Congress intends that a territorial invasion of the right in controversy involving less than $3,000 should have its litigation in the territorial courts." The court then reached the conclusion that un-

---

[59] It may be asserted that the District Court for Hawaii when it sits en banc may not be comprised of more than two judges since Section 133 of revised Title 28 provides, as did Section 86 of the Organic Act, for only two district judges in Hawaii. Such a limitation in our opinion does not exist. Section 132(b) of revised Title 28 provides, it is true, that each district court shall consist of the district judges for the district in active service. But that sub-section also provides that, " * * * judges designated or assigned shall be competent to sit as judges of the court." The two judges sitting in this case with the Chief Judge of the District Court were thus designated or assigned and comprise a court of three judges sitting en banc.

The other District Judge for Hawaii did not sit. This fact does not prevent this tribunal from exercising jurisdiction in the instant cases for it is a rule of general application that the death, disqualification or absence of a judge will not deprive the remaining judges of the court of authority to hold court and to adjudicate cases provided that the number of the court is not reduced below that legally required for the transaction of business. See 14 Am.Jur., Courts, Sec. 58, p. 282; 21 C.J.S., Courts, § 183(b), page 294, and the authorities cited therein. See also the opinion of Mr. Chief Justice Marshall in Pollard v. Dwight, 4 Cranch 421, 8 U.S. 421, 2 L. Ed. 666; Frank v. Bayuk, 322 Pa. 282, 284, 185 A. 705, 706; Zimmerman v. Pennsylvania R. Co., 293 Pa. 264, 266, 142 A. 220; In re McCormick's Contested Election, 281 Pa. 281, 285, 126 A. 568, 570; Cowan v. Murch, 97 Tenn. 590, 601, 37 S.W. 393, 396, 34 L.R.A. 538, and Long v. State, 59 Tex.Cr.R. 103, 116, 127 S.W. 551, 558, Ann.Cas.1912A, 1244. By Section 132(c) of revised Title 28, a quorum of the United States District Court for the District of Hawaii consists of but one judge. Section 132(b) seems to dispose of any possible doubt respecting the authority of the three judges shown on this opinion to sit en banc in the instant cases and to adjudicate the issues presented.

less appropriate amendments as to jurisdictional amounts were made the complaint would have to be dismissed as to the plaintiffs designated.

Whatever may have been the extent of the jurisdiction of the District Court for Hawaii at the time of the decision in the Mo Hock Ke Lok Po case, viz. on October 22, 1947, we entertain no doubt for the reasons stated under the last heading of this opinion that the jurisdiction of the District Court for Hawaii is for the purposes of the instant cases co-extensive with that of any district court of the United States; that of the District of Nevada, for example. It must be pointed out that R.S. § 1979, 8 U.S.C.A. § 43 provides that: "Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." See also R.S. § 1977, 8 U.S.C.A. § 41, which provides that: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

Section 1343 of revised Title 28, treating of civil rights, provides: "The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person: (1) To recover damages for injury to his person or property, or because of the deprivation of any right or privilege of a citizen of the United States, by any act done in furtherance of any conspiracy mentioned in Section 47 of Title 8; (2) To recover damages from any person who fails to prevent or to aid in preventing any wrongs mentioned in section 47 of Title 8 which he had knowledge were about to occur and power to prevent; [and in particular] (3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured·by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States." The suits at bar based on deprivation of civil rights, may be maintained without allegations of jurisdictional amounts as was required by old Section 24(1), now Section 1331 of revised Title 28. See Hague v. Committee for Industrial Organization, 3 Cir., 101 F.2d 774, 788, affirmed, though modified·on other grounds, in Hague v. C. I. O., 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423. Nor is citizenship a necessary factor. Id. pages 307 U.S. at 526 and 531, 59 S.Ct. 954. We so hold in respect to both suits.

As we have stated, the two major industries of the Hawaiian Islands are the growing of sugar cane and pineapples and a very great part of these products moves in commerce to the United States mainland. It cannot be doubted that the interruption of equable and peaceful labor relations in the Territory by strikes in the sugar and pineapple industries will affect disastrously that flow of commerce. The provisions of the Labor Management Relations Act 1947, 29 U.S.C.A. §§ 157, 158, are applicable to the Territory of Hawaii. See Rules and Regulations Implementing National Labor Relations Act amended by Labor Management Relations Act, 1947, Series 5, 29 U.S.C.A. § 203.7, which states, "The term 'State' as used herein shall include * * * all * * * Territories * * * of the United States." Upon analogy, therefore, to the doctrine enunciated by the Supreme Court in A. F. of L. v. Watson, 327 U.S. 582, 589–592, 66 S.Ct. 761, 90 L.Ed. 873, and in view of the findings hereinafter made respecting the impact of both the unlawful assembly and riot act and the conspiracy statute of the Territory of Hawaii, respectively Chapters 277 and 243 of the Revised Laws of Hawaii 1945, and the manner of the statutes' enforcement on labor relations in the Territory, we conclude that this court has jurisdiction of the instant causes under Section 1337 of revised Title 28 U.S.

C.A., as well as under Section 1343 of that title.

### As to the Constitutionality of the Unlawful Assembly and Riot Act of the Territory of Hawaii.

It will be borne in mind that the individual plaintiffs, Kaholokula and others, Rania aside, at No. 836, have been indicted for unlawful assembly and riot and conspiracy in the indictment No. 2365, and that the individual plaintiffs at No. 828, Kawano aside, are held on complaints based on the unlawful assembly and riot act. For these reasons the constitutionality of both statutes is attacked.

The unlawful assembly and riot act of the Territory of Hawaii, "Riots and Unlawful Assemblies", Chapter 277, as contained in the Revised Laws of Hawaii 1945, in pertinent part is set out in the footnote.[60] The origin of the law is shrouded in some obscurity. It came into written existence through the hands of the Honorable Wil-

[60] Sec. 11570. "Where three or more persons are, of their own authority, assembled together with disturbance, tumult and violence, and striking terror or tending to strike terror into others, such meeting is an unlawful assembly, within the meaning of the provisions of this chapter."

Sec. 11571. "A riot is where three or more being in unlawful assembly join in doing or actually beginning to do an act, with tumult and violence, and striking terror, or tending to strike terror into others."

Sec. 11572. "Menacing language, or gestures, or show of weapons or other signs or demonstrations tending to excite terror in others, are sufficient violence to characterize an unlawful assembly or riot."

Sec. 11573. "Concurrence in an intent of tumult and violence, and in any violent tumultuous act, tending to strike terror into others, is a sufficient joining in intent to constitute a riot, though the parties concerned did not previously concur in intending the act. For example, where persons present at a public performance concur in the intent to disturb the same by tumult and violence, tending to strike terror; or concur in one or more acts of tumult or violence tending to strike terror, done by any of the assembly."

Sec. 11574. "It is not requisite in order to constitute an unlawful assembly or riot, that persons should have come together with a common or unlawful intent, or in any unlawful manner; or that the object of the meeting, or the act done or intended, should of itself be unlawful. The tumult and violence tending to excite terror, characterize the offense, though the persons may have assembled in a lawful manner, and though the object of the meeting, if legally pursued, or the act done or intended, if performed in a proper manner, would be lawful."

Sec. 11575. "Persons present at a riot or unlawful assembly, and promoting the same or aiding, abetting, encouraging or countenancing the parties concerned therein by words, signs, acts or otherwise, are themselves parties thereto and principals therein."

Sec. 11576. "In case of an unlawful assembly being by proclamation or otherwise ordered to disperse by any one having legal authority to disperse the same, any one voluntarily remaining in the assembly after notice of the order, except for keeping the peace, is thereby a party concerned in the unlawful assembly."

Sec. 11577. "Every person present in an unlawful assembly is presumed to have notice of an order given by lawful authority in lawful manner for the same to disperse."

Sec. 11578. "Whoever is guilty of a riot or unlawful assembly, having for its object the destruction or injury of any house, building, bridge, wharf, or other erection or structure; or the destruction or injury of any ship or vessel, or furniture, apparel of cargo thereof, shall be punished by imprisonment at hard labor not more than two years, or by fine not exceeding five hundred dollars; and shall also be answerable to any person injured to the full amount of his damage."

Sec. 11579. "Whoever is guilty of being a party concerned in a riot or unlawful assembly endangering the life, limb, health or liberty of any person, or in any other riot or unlawful assembly, not of the description designated in section 11578, shall be punished by a fine not exceeding one thousand dollars or by imprisonment at hard labor for not more than twenty years."

Sec. 11580. "If upon the trial of any person for being concerned in a riot or unlawful assembly as described in section 11579, the jury shall not be satisfied that such person is guilty thereof, but shall be satisfied that he is guilty of any offense mentioned in section 11578, then the jury may return as their verdict that he is not guilty of the offense

liam Little Lee, the first Chief Justice of the Supreme Court of Hawaii. On September 27, 1847 the King-appointed House of Nobles and Representatives of Hawaii by resolution authorized Mr. Lee to examine the laws of Hawaii and in effect to compile them.[61] The unlawful assembly and riot act may perhaps have been in existence by edict promulgation prior to 1833 when King Kamehameha III came to the throne. The law appears in substance in the Penal Code of the Hawaiian Islands adopted by the House of Nobles and Representatives on June 21, 1850 known colloquially as "Lee's Compilation." In any event it is clear that the statute predates the Hawaiian Constitution of 1852 by at least two years.

The unlawful assembly and riot act of the Territory of Hawaii, Sections 11570–11584, Revised Laws of Hawaii 1945, bears a startling resemblance to the substance of the riot act of George I.[62] Indeed, it may

charged, but is guilty of such offense, and he may be punished accordingly."

Sec. 11581. "In case of any riot or unlawful assembly in any town, village or district, it shall be the duty of every district magistrate there resident, and also of the high sheriff, sheriff, and his deputies, and of the chief of police for the town, village or district to go among the persons so assembled, or as near to them as may be with safety, and in the name of the Territory to command all the persons so assembled immediately and peaceably to disperse; and if the persons shall not thereupon so disperse, it shall be the duty of each of the officers to command the assistance of all persons present, in seizing, arresting and securing in custody the persons so unlawfully assembled, so that they may be proceeded with for their offense according to law."

Sec. 11582. "If any persons riotously or unlawfully assembled, who have been commanded to disperse by the high sheriff, sheriff, deputy sheriff, chief of police, or district magistrate, shall refuse or neglect to disperse without unnecessary delay, any two of the officers may require the aid of a sufficient number of persons in arms, or otherwise, as may be necessary, and shall proceed in such manner as in their judgment shall be expedient forthwith to disperse and suppress the unlawful, riotous, or tumultuous assembly, and seize and secure the persons composing the same, so that they may be proceeded with according to law."

Sec. 11583. "Whenever an armed force shall be called out for the purpose of suppressing any tumult or riot or unlawful assembly, or to disperse any body of riotous men, the armed force shall obey such orders for suppressing the riot or tumult or for dispersing and arresting the persons who are committing any of the said offenses, as they may receive from the high sheriff, sheriff, or chief of police, and also such further orders as they may receive after they shall arrive at the place of the unlawful, riotous or tumultuous assembly, as may be given by any two of the magistrates or officers mentioned in the preceding section."

Sec. 11584. "If by reason of the efforts made by any two or more such magistrates or officers, or by their direction, to disperse the unlawful, riotous or tumultuous assembly, or to seize and secure the persons composing the same, who have refused to disperse, any such person or any other person then present, as spectators or otherwise, shall be killed or wounded, the magistrates and officers and all persons acting by their order or under their direction shall be held guiltless and justified by law, and if any of the magistrates or officers, or any person acting under their authority or by their direction shall be killed or wounded, all the persons so at the time unlawfully, riotously or tumultuously assembled, and all other persons who, when commanded or required, shall have refused to aid and assist the magistrates or officers, shall be held answerable therefor."

[61] See Journal House of Representatives, Hawaii, September 27, 1847, p. 15. See Defendants' Exhibit P, a memorandum prepared by Maude Jones, Archivist, Board of Commissioners of Public Archives.

[62] Geo. I, stat. 2, c. 5. Cf. also 36 Geo. III, c. 8, and discussion in Buckle, History of Civilization in England, Vol. I, 351, cited to the text in note 9 in Bridges v. California, 314 U.S. 252, at page 265, 62 S.Ct. 190, at page 195, 86 L.Ed. 192, 159 A.L.R. 1346.

The statute of Geo. I is as follows:

"Whereas of late many rebellious riots and tumults have been in divers parts of this kingdom, to the disturbance of the publick peace, and the endangering of his Majesties person and government, and the same are yet continued and fomented by persons disaffected to his Majesty, presuming so to do, for that the punishments provided by the laws now in being are not adequate to such heinous offences; and by such rioters his Majesty and his administration have been most maliciously and falsely traduced, with an intent to raise divisions, and to alienate

be fairly stated that the George First statute is more favorable to the public and to civil rights than is the unlawful assembly and riot act of Hawaii. It should be noted at the outset that the statute of George I deemed a gathering not to be dangerous until twelve persons had assembled, whereas the territorial statute considers an assembly of "three or more persons" as containing a threat of danger. Both statutes

the affections of the people from his Majesty: Therefore for the preventing and suppressing of such riots and tumults, and for the more speedy and effectual punishing the offenders therein, be it enacted by the Kings most excellent Majesty, by and with the advice and consent of the lords spiritual and temporal, and of the commons, in this present Parliament assembled, and by the authority of the same, that: If any persons, to the number of twelve or more, being unlawfully, riotously, and tumultuously assembled together, to the disturbance of the publick peace, at any time after the last day of July in the year of our Lord one thousand seven hundred and fifteen, and being required or commanded by any one or more justice or justices of the peace, or by the sheriff of the county, or his under-sheriff, or by the mayor, bailiff or bailiffs, or other head officer, or justice of the peace of any city or town-corporate, where such assembly shall be, by proclamation to be made in the Kings name, in the form hereinafter directed, to disperse themselves, and peaceably to depart to their habitations or to their lawful business, shall to the number of twelve or more (notwithstanding such proclamation made) unlawfully, riotously and tumultuously remain or continue together by the space of one hour after such command or request made by proclamation that then such continuing together to the number of twelve or more, after such command or request made by proclamation, shall be adjudged felony without benefit of clergy, and the offenders therein shall be adjudged felons, and shall suffer death as in case of felony without benefit of clergy.

"II. And be it further enacted by the authority aforesaid, That the order and form of the proclamations that shall be made by the authority of this Act shall be as hereafter followeth, (that is to say) the justice of the peace, or other person authorized by this Act to make the said proclamation, shall, among the said rioters, or as near to them as he can safely come, with a loud voice command or cause to be commanded silence to be while proclamation is making and after that, shall openly and with loud voice make or cause to be made proclamation in this words or like in effect: Our sovereign lord the King chargeth and commandeth all persons, being assembled, immediately to disperse themselves, and peaceably to depart to their habitations or to their lawful business, upon the pains contained in the Act made in the first year of King George, for preventing tumults and riotous assemblies. God save the King.

"And every such justice and justices of the peace, sheriff, under-sheriff, mayor, bailiff, and other head officer aforesaid, within the limits of their respective jurisdictions, are hereby authorised, impowered, and required, on notice or knowledge of any such unlawful, riotous, and tumultuous assembly, to resort to the place where such unlawful, riotous, and tumultuous assembly shall be, of persons to the number of twelve or more, and there to make or cause to be made proclamation in manner aforesaid.

"III. And be it further enacted by the Authority aforesaid, That if such persons so unlawfully, riotously, and tumultuously assembled, or twelve or more of them, after proclamation made in manner aforesaid, shall continue together, and not disperse themselves within one hour, that then it shall and may be lawful to and for every justice of the peace, sheriff or under-sheriff of the county where such assembly shall be, and also to and for every high or petty constable, and other peace-officer within such county, also to and for every mayor, justice of the peace, sheriff, bailiff, and other head officer, high or petty constable, and other peace-officer of any city or town-corporate where such assembly shall be, and to and for such other person and persons as shall be commanded to be assisting unto any such justice of the peace, sheriff or under-sheriff, mayor, bailiff, or other head officer aforesaid (who are hereby authorized and impowered to command all his Majesties subjects of age and ability to be assisting to them therein) to seize and apprehend, and they are hereby required to seize and apprehend such persons so unlawfully, riotously, and tumultuously continuing together after proclamation made as aforesaid, and forthwith to carry the persons so apprehended before one or more of his Majesties justices of the peace of the county or place where such persons shall be so apprehended, in order to their being proceeded against for such their offences according to law; and that if the persons so unlawfully, riotously, and tumultuously assembled, or any of them,

seem to consider a gathering of persons "of their own authority," as contradistinguished from a gathering authorized by the sovereign, as menacing to public order. The statute of George the First required law enforcement officers to order a riotous crowd to disperse, and there had to be a failure on the part of the people to obey this command before the severe penalties of the statute could be invoked. But the Supreme Court

shall happen to be killed, maimed, or hurt in the dispersing, seizing, or apprehending, or endeavouring to disperse, seize, or apprehend them, by reason of their resisting the persons so dispersing, seizing, or apprehending or endeavouring to disperse, seize, or apprehend them, that then every such justice of the peace, sheriff, under-sheriff, mayor, bailiff, head officer, high or petty constable, or other peace-officer, and all and singular persons, being aiding and assisting to them, or any of them, shall be free, discharged, and indemnified, as well against the Kings Majesty, his heirs and successors, as against all and every other person and persons of, for, or concerning the killing, maiming, or hurting of any such person or persons, so unlawfully, riotously and tumultuously assembled, that shall happen to be so killed, maimed, or hurt as aforesaid.

"IV. And be it further enacted by the authority aforesaid, That if any persons unlawfully, riotously and tumultuously assembled together, to the disturbance of the publick peace, shall unlawfully, and with force demolish or pull down, or begin to demolish or pull down any church or chapel, or any building for religious worship certified and registered according to the statute made in the first year of the reign of the late King William and Queen Mary, intitled, An Act for exempting their Majesties Protestant subjects dissenting from the Church of England from the penalties of certain laws, or any dwelling-house, barn, stable, or other out-house, that then every such demolishing, or pulling down, or beginning to demolish, or pull down, shall be adjudged felony without benefit of clergy, and the offenders therein shall be adjudged felons, and shall suffer death as in case of felony without benefit of clergy. [This section repealed 7 & 8 Geo. 4, c. 27, s. 1.]

"V. Provided always, and be it further enacted by the authority aforesaid, That if any person or persons do or shall, with force and arms, willfully and knowingly oppose, obstruct, or in any manner wilfully and knowingly lett, hinder, or hurt any person or persons that shall begin to proclaim or go to proclaim according to the proclamation hereby directed to be made, whereby such proclamation shall not be made, that then every such opposing, obstructing, letting, hindring, or hurting such person or persons so beginning or going to make such proclamation as aforesaid, shall be adjudged felony without benefit of clergy, and the offenders therein shall be adjudged felons, and shall suffer death as in case of felony, without benefit of clergy; and that also every such person or persons so being unlawfully, riotously and tumultuously assembled, to the number of twelve, as aforesaid, or more, to whom proclamation should or ought to have been made if the same had not been hindred, as aforesaid, shall likewise, in case they are any of them, to the number of twelve or more, shall continue together, and not disperse themselves within one hour after such lett or hindrance so made, having knowledge of such lett or hindrance so made, shall be adjudged felons, and shall suffer death as in case of felony without benefit of clergy.

"VI. And be it further enacted by the authority aforesaid, That if after the said last day of July one thousand seven hundred and fifteen, any such church or chapel, or any such building for religious worship, or any such dwelling-house, barn, stable, or other out-house, shall be demolished or pulled down wholly, or in part, by any persons so unlawfully, riottously and tumultuously assembled, that then, in case such church, chapel, building for religious worship, dwelling-house, barn, stable or out-house, shall be out of any City or Town, that is either a county of itself, or is not within any hundred, that then the inhabitants of the hundred in which such damage shall be done, shall be liable to yield damages to the person or persons injured and damnified by such demolishing or pulling down wholly or in part; and such damages shall and may be recovered by action to be brought in any of his Majesty's Courts of Record at Westminster (wherein no essoin, protection, or wager of law, or any imparlance shall be allowed) by the person or persons damnified thereby, against any two or more of the inhabitants of such hundred, such action for damages to any church or chapel to be brought in the name of the rector, vicar or curate of such church or chapel that shall be so damnified, in trust for applying the damages to be recovered in rebuilding or repairing such church or chapel; and that judgment being given for the plaintiff or plaintiffs in such action, the damages so to be recovered shall, at the request of such plaintiff or plaintiffs, his or their ex-

of Hawaii in Territory of Hawaii v. Joseph Kaholokula, et al., supra, 37 Haw. at page 639, held that no command to disperse was necessary in order that the penalties prescribed by the law might be invoked. See in particular the Court's interpretation of Section 11581.[63] Under the statute of George I no felony was committed unless the rioters remained together for a period of an hour after an order to disperse was given. The territorial statute is not clear in respect to the length of time that rioters must remain together. The crime under the ruling of the Supreme Court of Hawaii in the Kaholokula case seems to be completed eo instanti when three or more persons have assembled under the conditions set out in Section 11570. Section 11576, relating to

---

ecutors or administrators, be raised and levied on the inhabitants of such hundred, and paid to such plaintiff or plaintiffs in such manner and form, and by such ways and means, as are provided by the statute made in the seven and twentieth year of the reign of Queen Elizabeth, for reimbursing the persons on whom any money recovered against any hundred by any party robbed, shall be levied: And in case any such church, chapel, building for religious worship, dwelling-house, barn, stable, or out-house so damnified, shall be in any city or town that is either a county of itself, or is not within any hundred, that then such damages shall and may be recovered by action to be brought in manner aforesaid (wherein no essoin, protection or wager of law, or any imparlance shall be allowed) against two or more inhabitants of such city or town; and judgment being given for the plaintiff or plaintiffs in such action, the damages so to be recovered shall, at the request of such plaintiff or plaintiffs, his or their executors or administrators, made to the justices of the peace of such city or town, at any Quarter-Sessions to be holden for the said city or town, be raised and levied on the inhabitants of such city or town, and paid to such plaintiff or plaintiffs, in such manner and form, and by such ways and means, as are provided by the said statute made in the seven and twentieth year of the reign of Queen Elizabeth, for reimbursing the person or persons on whom any money recovered against any hundred by any party robbed, shall be levied. [This section repealed 7 & 8 Geo. 4, c. 27, s. 1.]

"VII. And be it further enacted by the authority aforesaid, That this Act shall be openly read at every Quarter-Sessions, and at every leet or law-day.

"VIII. Provided always, That no person or persons shall be prosecuted by virtue of this act, for any offence or offences committed contrary to the same, unless such prosecution be commenced within twelve months after the offence committed.

"IX. And be it further enacted by the authority aforesaid, That the sheriffs and their deputies, stewards and their deputies, bailes of regalities and their deputies, magistrates of royal boroughs, and all other inferior judges and magistrates, and also all high and petty-constables, or other peace-officers and County, stewartry, city, or town, within that part of Great Britain called Scotland, shall have the same powers and authority for putting this present act in execution within Scotland, as the justices of the peace and other magistrates aforesaid, respectively have by virtue of this Act, within and for the other parts of this kingdom; and that all and every person and persons who shall at any time be convicted of any of the offences aforementioned, within that part of Great Britain called Scotland, shall for such offence incur and suffer the pain of death and confiscation of moveables: And also that all prosecutions for repairing the damages of any church or chapel, or any building for religious worship, or any dwelling-house, barn, stable, or outhouse, which shall be demolished or pulled down in whole or in part, within Scotland, by any person unlawfully, riotously or tumultuously assembled, shall and may be recovered by summary action, at the instance of the party aggrieved, his or her heirs, or executors, against the county, stewartry, city or borough respectively, where such disorders shall happen, the magistrates being summoned in the ordinary form, and the several counties and stewartries called by edictal citation at the market-cross of the head-borough of such county or stewartry respectively, and that in general, without mentioning their names and designations.

"X. Provided, and it is hereby declared, That this Act shall extend to all places for religious worship in that part of Great Britain called Scotland, which were tolerated by law, and where his Majesty King George, the Prince and Princes of Wales, and their issue are prayed for in express words."

[63] We note parenthetically that none of the officers present during the course of the Paia incident, probably twenty in number, gave any order requiring the strikers to disperse and that the Loitering statute, Section 11773, was read by Assistant Chief of Police Freitas.

the crowd remaining together after an order to disperse is given, therefore becomes of little relevancy.

Section 11570 of the unlawful assembly and riot act of Hawaii undertakes to define "an unlawful assembly". Any assembly of three or more persons "of their own authority" which meets or gathers with disturbance, tumult and violence "striking terror or tending to strike terror into others" is brought within the purview of Chapter 277. Any large group of persons (unless they be persons subject to discipline such as a company of soldiers turning out to fall in) ordinarily will meet or gather with some disturbance or tumult. Three persons in assembly, however, would have to exert their physical capabilities to a considerable degree to meet with appreciable disturbance or tumult. The word "violence" employed in the section surely has its ordinary legal meaning: "The abuse of force. That force which is employed against common right, against the laws, and against public liberty.", "Violence is synonomous with physical force * * *". Bouvier's Law Dictionary, Rawle's 3rd Revision. This much of the section is plain. But Section 11570 goes on to provide that the disturbance, tumult and violence must be one "striking terror or tending to strike terror into others * * *". The test here laid down is purely subjective and is very vague. An old fashioned charivari would come within the section's ambit. The test of reasonableness is absent from the statute.

But the definition is further complicated by the provisions of Section 11572 which contains a broader characterization of "an unlawful assembly" and also, as we shall see, of a "riot". Menacing language or menacing gestures, or show of weapons "or other signs or demonstrations tending to excite terror in others" are stated to be "sufficient violence to characterize an unlawful assembly". A political meeting, the participants in which carry banners or transparencies attacking members of the opposition party and stating that they will be put out of public office, would lie within the purview of the words of the section last quoted. In short, any violence or attack, even a verbal or printed one, would make the members of a gathering liable to the penalties prescribed by the statute. Any gathering of pickets, or any picketing, however peaceful, might well "excite terror" in the mind of an employer of labor. Indeed the statute received such an interpretation in effect from the Circuit Court of the Second Circuit by Judge Wirtz, when he issued the ex parte injunction referred to above. See note 21, supra. Section 11570 read in conjunction with Section 11572 is so vague that it necessarily fails to meet the test of certainty laid down by the Supreme Court of the United States in Lanzetta v. New Jersey, 306 U.S. 451, 453, 59 S.Ct. 618, 83 L.Ed. 888, and United States v. Cohen Grocery Co., 255 U.S. 81, 41 S.Ct. 298, 65 L. Ed. 516, 14 A.L.R. 1045.

Concerning Section 11571, which defines a "riot", the same lack of clarity is apparent for the section states nothing more than " * * * where three or more being in unlawful assembly join in doing or actually beginning to do an act, with tumult and violence, and striking terror, or tending to strike terror into others." Again the test "striking terror, or tending to strike terror into others", is necessarily one which must be purely subjective and hence objectionable. Moreover, Section 11572, as is the case in regard to the definition of "an unlawful assembly" under Section 11570, has been interpolated into Section 11571, " * * * [any] gestures * * * tending to excite terror in others, are sufficient to characterize * * * [a] riot".

Section 11573 deals with concurrence in intent. The provisions of this section are unusual. We shall not repeat them in detail in this opinion but we point out that the first part of the section provides that "Concurrence in an intent of tumult and violence [to be read of course in connection with the definitions of Section 11570], and in any violent tumultuous act, tending to strike terror into others, is a sufficient joining in intent to constitute a riot * * *". It should be noted that a fair reading of the statute requires the conclusion that "an intent of tumult and violence" is of itself "a sufficient joining in intent to constitute a riot". The phrase "and in any violent tumultuous act," separated in the text by commas, is plainly another and a separate ground upon which a "joining in intent to

constitute a riot" may be found. We would agree that any violent tumultuous act on the part of a member of a mob could and should be sufficient to join the actor in the common unlawful intent to maintain a riot. But the section goes much further than this and, as we have indicated, makes a state of mind, without an overt act, illegal and subject to the penalties of the statute. Indeed, it is fair to say that Section 11573 supplies guilt by a kind of association. Guilt could be implied by the mere presence at the scene of any person. There is no reasonable certainty in the section.

Section 11574 states that "It is not requisite in order to constitute an unlawful assembly or riot, that persons should have come together with a common or unlawful intent, or in any unlawful manner; or that the object of the meeting, or the act done or intended, should of itself be unlawful." The second sentence provides that "The tumult and violence tending to excite terror characterize the offense, though the persons may have assembled in a lawful manner, and though the object of the meeting, if legally pursued, or the act done or intended, if performed in a proper manner, would be lawful." We do not know what this language means and counsel have suggested no helpful solution. Cf. the opinion of the Supreme Court of Hawaii in the Kaholokula case, supra, 37 Haw. at pages 628, 629. The section seems to intend the effect, however, that if any terror be excited, a lawful meeting performing lawful acts would fall within the ambit of Chapter 277 and the participants therein would become subject to the penalties of the statute.[64]

Section 11575 deals with promoting or aiding a riot or unlawful assembly and states that any one present aiding, abetting, encouraging or "countenancing" the parties concerned therein by words, signs, acts, "or otherwise" are themselves principals therein. The verb "countenance" means "to give countenance to; to encourage; favor; approve."[65] It would necessarily follow that any one whose mien or appearance was deemed to favor the assembly would himself be guilty as a principal.

Section 11576 provides simply that upon "an unlawful assembly" being ordered to disperse by any one having legal authority to order it to disperse, any person voluntarily remaining in the assembly, "except for keeping the peace" is " * * * a party concerned in the unlawful assembly." It was the obvious intent of the framers of this section to make any one remaining on the scene, after an order to disperse was given, a participant in the crime and subject to the penalties of the act. But Section 11577 provides that "Every person present in an unlawful assembly is presumed to have notice of an order * * *" to disperse. Here guilt is created by presumption.

As we have indicated, Section 11572 provides that any menacing language or gestures or other signs or demonstrations tending to excite terror in others are sufficient to characterize an assembly as unlawful. Section 11579 provides that "Whoever is guilty of being a party concerned in a riot or unlawful assembly endangering the life, limb, health or liberty of any person" shall be punished by a fine not exceeding $1,000 or by imprisonment at hard labor for not more than twenty years. But the clause just quoted is qualified by the phrase "not of the description designated in section 11578". The provisions of Section 11572 would seem to make any person found guilty of unlawful assembly and riot (other than persons engaging in riots with the object of destruction of property designated in Section 11578) subject to a term of imprisonment at hard labor for not more than twenty years.[66] Cf. the comments of the Supreme Court of Hawaii in the Kaholokula case, 37 Haw. at pages 628, 629.

No part of the text of Section 11580 need be repeated here. The Supreme Court of

---

[64] Sections 11572–11574 are said by the Supreme Court of Hawaii in the Kaholokula case, 37 Haw. at page 628, to be "explanatory of statutory definitions of the offenses of unlawful assembly and riot * * *" But the sections cited seem to us to go much further than this explanation suggests.

[65] Webster's New International Dictionary, 2nd Edition.

[66] See, however, the provisions of Section 10842 of the Revised Laws of Hawaii 1945, relating to indeterminate sentences.

Hawaii seemed to entertain doubts as to its validity in the Kaholokula case. 37 Haw. at page 641. The section's meaning turns on the interpretation of Section 11579 and we think the terms of Section 11580 are so indefinite and uncertain as to fall clearly within the ban of the decisions of the Supreme Court of the United States last cited herein. Indeed, as we have indicated, the whole statute falls within the interdiction. No part of it can be saved.

But Chapter 277 possesses other substantial vices. We entertain no doubt that the provisions of the First Amendment to the Constitution of the United States are applicable to the Territory of Hawaii. See Farrington v. Tokushige, 273 U.S. 284, 298, 299, 47 S.Ct. 406, 71 L.Ed. 646. See the Mo Hock Ke Lok Po case. If not, it is clear that the provisions of the Fifth Amendment do apply despite the fact that Hawaii is a territory. We have likened Chapter 277 to the riot act of George the First. Like that statute it is a gross trespass on the rights of free speech and assembly as guaranteed by the Constitution of the United States. That the Supreme Court of the United States would so regard it we think is implicit in the statements made by Mr. Justice Black in Bridges v. California, 314 U.S. 252, 265, 62 S.Ct. 190, 195, 86 L.Ed. 192, 159 A.L.R. 1346. He said specifically that " * * * the restrictions upon assembly [9] then prevalent in England would have been regarded as measures which the Constitution prohibited the American Congress from passing". Note "9" cited to the text of Mr. Justice Black's opinion, as has been said, refers specifically to the riot act of George I. Compare the treatment by the Supreme Court of the United States [67] of like restrictions which have been attempted to be placed upon the rights guaranteed against encroachment by the first ten Amendments to the Constitution.

The statute sub judice must be judged upon its face. The case of Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L. Ed. 1093, is particularly apposite. The Alabama statute, Section 3448 of the State Code of 1923, Code 1940, Tit. 14, § 55, prohibited loitering or picketing. The words of Mr. Justice Murphy require repetition. He said, 310 U.S. at pages 97, 98, 60 S.Ct. at page 742: "The existence of such a statute, which readily lends itself to harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure, results in a continuous and pervasive restraint on all freedom of discussion that might reasonably be regarded as within its purview. It is not any less effective or, if the restraint is not permissible, less pernicious than the restraint on freedom of discussion imposed by the threat of censorship. An accused, after arrest and conviction under such a statute, does not have to sustain the burden of demonstrating that the State could not constitutionally have written a different and specific statute covering his activities as disclosed by the charge and the evidence introduced against him. * * * Where regulations of the liberty of free discussion are concerned, there are special reasons for observing the rule that it is the statute, and not the accusation or the evidence under it, which prescribes the limits of permissible conduct and warns against transgression. * * * *"

The unlawful assembly and riot act of the Territory lays too great an emphasis on peace as distinguished from freedom. It exalts order at the expense of the freedom of speech and assembly guaranteed by the First Amendment to the Constitution of the United States. It offers a fertile field for the operation of the agent provocateur who may disturb any public gathering with comparative impunity and cause the arrest of the most innocent participant who may have

---

[9] See "Labor in the Territory of Hawaii, 1939", United States Department of Labor, Bulletin No. 687, Table 6 and notes cited to text at page 23. This bulletin is Plaintiffs' Exhibit No. 19.

[67] See Bridges v. California, supra; Winters v. New York, 333 U.S. 507, 68 S.Ct. 665; Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213, 128 A.L.R. 1352; Hague v. C. I. O., 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423; Grosjean v. American Press Co., 297 U. S. 233, 56 S.Ct. 444, 80 L.Ed. 660; Near v. Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357. Cf. Cole v. Arkansas, 333 U.S. 196, 68 S.Ct. 514.

to stand trial under a theory of guilt by association and presumption.

▆ Among the statute's disabilities are the very heavy penalties which it imposes. They seem out of proportion to the crimes. Compare the VIII Amendment to the Constitution of the United States which prohibits cruel and unusual punishments. While many of the States have not dissimilar statutes there is none which authorizes such a heavy penalty as the statute of Hawaii. Most of the statutes prescribe penalties, fines aside, of a few months', or a year's, maximum imprisonment.[68] As Professor Chafee states in "Free Speech in the United States," it is unrealistic to hold "twenty years in prison before a speaker and call him free to speak * * *"[69] It should be noted again that the very heavy penalty prescribed by Section 11579 first appeared in the statute in 1929, following the disastrous strike of Filipino laborers in Hawaii in 1924. See ante under the heading "The ILWU and the Labor Picture." See Laws of the Territory of Hawaii, 1929, Act 4, p. 3.

▆▆ We have given careful consideration to the decision of the Supreme Court of Hawaii in the Kaholokula case and to Judge Peters' thoughtful opinion. The ruling is entitled to great weight. But we are a court of the United States construing provisions of the Federal Constitution. We are constrained to a conclusion respecting the unlawful assembly and riot act opposite to that expressed by the Supreme Court of Hawaii. We hold the statute to be unconstitutional for the reasons stated.

### As to the Constitutionality of the Conspiracy Statute of Hawaii.

It will be borne in mind that the individual plaintiffs at No. 836, Kaholokula and others, Rania aside, have been indicted for conspiracy, third degree, in the indictment at No. 2365. Accordingly they attack the constitutionality of the conspiracy statute of the Territory of Hawaii.[70] The first part of Section 11120 (the example aside) defines conspiracy. It provides that "A conspiracy is a malicious or fraudulent

---

[68] See Appendix III to Professor Zechariah Chafee's book, "Free Speech in the United States", at p. 575 et seq., Harvard University Press, 1941.

[69] Id. at p. 10.

[70] Sec. 11120. "A conspiracy is a malicious or fraudulent combination or mutual undertaking or concerting together of two or more, to commit any offense or instigate any one thereto, or charge any one therewith; or to do what plainly and directly tends to excite or occasion offense, or what is obviously and directly wrongfully injurious to another:

"For instance—A confederacy to commit murder, robbery, theft, burglary or any other offense prohibited by law; to prevent, obstruct, defeat or pervert the course of justice, by suborning a witness, tampering with jurors, or the like offenses; to groundlessly accuse any one of, and cause him to be prosecuted for, an offense; to charge any one with an offense, with the intent and for the purpose of extorting money from him; to falsely charge one with being the father of an illegtimate child; to cheat another by means of false tokens and pretenses; to manufacture a spurious article for the purpose of defrauding whomsoever the same can be sold to; to destroy a will and thereby prejudice the devisees; to prevent another, by indirect and sinister means, from exercising his trade, and to impoverish him; to establish, manage or conduct a trust or monopoly in the purchase or sale of any commodity."

Sec. 11121. "Any person knowingly acceding to and joining in a conspiracy after the same is formed, is a party thereto, no less than the one who originally takes part in forming the same."

Sec. 11122. "It is not requisite that the act agreed upon should be done or attempted in pursuance of the conspiracy; the conspiracy itself constitutes the offense."

Sec. 11123. "The act of each party to a conspiracy, in pursuance thereof, is the act of all."

Sec. 11124. "Husband and wife cannot by themselves, without others, be guilty of a conspiracy, and the acts or confessions of either are not evidence against the other in a prosecution for conspiracy."

Sec. 11127. "On a prosecution for conspiracy, if the jury find, or the magistrate having jurisdiction of the fact consider, the offense to be trivial, the defendants shall be discharged, with or without costs, in the discretion of the court."

Sec. 11128. "Conspiracy to commit, or to instigate to the commission of a felony; or to charge any one with felony; or to prevent, obstruct, defeat, or pervert the course of justice; or to forge

combination or mutual undertaking or concerting together of two or more, to commit any offense or instigate anyone thereto, or charge anyone therewith; or to do what plainly and directly tends to excite or occasion offense, or what is obviously and directly wrongfully injurious to another: * * *"

■ The conspiracy statute came into the written law of Hawaii in Lee's Compilation, Penal Code of June 21, 1850, in substance as it is today insofar as is pertinent in the instant cases though it, like the unlawful assembly and riot act, may have had earlier existence as a promulgated edict. We are of the opinion that the statute is so broad and vague as to fall within the prohibitions of the authorities cited under the previous heading. The constitutionality of the conspiracy statute has never been tested in this regard insofar as we can ascertain, albeit some of its terms, Section 5720, Revised Laws of Hawaii 1935 in haec verba with Section 11120 of Revised Laws of Hawaii 1945, are discussed and approved in Territory v. Hart, 35 Haw. 188, 195-197. Cf. Territory v. Reyes, 33 Haw. 180, and The King v. Joe, 8 Haw. 287, 288. Section 11120 as drawn is bad on its face; particularly in view of the last clause following the first semicolon as quoted in note 70, supra. The term "offense" is clarified, if clarification be necessary, by the provisions of Section 10601, contained in Chapter 222, dealing with "Definitions", Revised Laws of Hawaii 1945. See Haas v. Henkel, 216 U.S. 462, 30 S.Ct. 249, 54 L.Ed. 569, 17 Ann.Cas. 1112, and Hammerschmidt v. United States, 265 U.S. 182, 44 S.Ct. 511, 68 L.Ed. 968. Cf. what was Section 37 of the Criminal Code, and since September 1, 1948 has become Section 371 of revised Title 18 U.S.C.A. Section 10601 states that "The term 'offense,' as used in the laws of the Territory, means the doing what a penal law forbids to be done, or omitting to do what it commands." The clause of Section 11120 referred to makes two or more persons guilty of conspiracy if they concert together to do "* * * what is obviously and directly wrongfully injurious to another * * *" and renders the section too vague to withstand attack. The word "wrongfully" is not a term of art in the criminal law. It means "In a wrong manner; unjustly; in a manner contrary to the moral law, or to justice." Bouvier's Law Dictionary, Rawle's Third Revision. Cf. the term "Wrong", Black's Law Dictionary, Third Edition. The test supplied by the statute is, therefore, one of moral law, and two or more persons concerting together to effect a breach of that law or to commit a sin, transgression or misdeed injurious to another, or to fail to do some act which morality requires, that failure being injurious to another, would be guilty of the crime of conspiracy under the statute. This would be true despite the fact that the act done or omitted to be done is not defined in the Penal Code of Hawaii or in any criminal law of the Territory. Cf. the provisions of Section 10601. This portion of the statute clearly does not meet the test of certainty.

■ But if we are wrong in respect to the foregoing conclusion, it is clear nevertheless that that part of the section following the semi-colon and quoted above does not by any means describe a crime. This part of Section 11120 defines a conspiracy as the doing of that which "plainly and directly tends to excite or occasion offense, or what is obviously and directly wrongfully injurious to another". If two or more persons were to agree to set up a

---

or counterfeit or cheat to an amount exceeding one hundred dollars, is in the first degree, and shall be punished by imprisonment at hard labor not more than ten years, or by fine not exceeding ten thousand dollars."

Sec. 11129. "A conspiracy to establish, create, manage or conduct a trust or monopoly in the purchase or sale of any commodity is in the second degree, and shall be punished by imprisonment at hard labor not more than two years, or by fine not exceeding one thousand dollars."

Sec. 11130. "Conspiracy not appearing to be in the first or second degree, is in the third degree, and shall be punished by imprisonment of not exceeding one year and by fine not exceeding four hundred dollars."

Sections 11125 and 11126, which relate to procedure, are not presently pertinent.

grocery store (note that the agreement alone, without any overt act, would be sufficient to constitute the crime under Section 11122) in competition with the store of another, under a literal interpretation of Section 11120 they would be guilty of the crime of conspiracy under the statute since what they contemplated doing would be obviously and directly "injurious" to the rival merchant. True, the section employs the word "wrongfully" before the phrase "injurious to another", but the word "wrongfully" is not a term of art in the law and means simply, as we have already stated, "In a wrong manner; unjustly; in a manner contrary to the moral law, or to justice". Bouvier's Law Dictionary, Rawle's 3rd Revision. No common law definition aids the statute in this respect. Cf. The King v. Angee, 8 Haw. 259, 260–262. We think it is obvious therefore that Section 11120 fails to state a crime cognizable by any standard of Anglo-American law and for the reasons given is contrary to the guarantees of the Fifth Amendment limiting federal action or to those of the Fourteenth Amendment curtailing action by a State.

The example or explanation contained in the Act (see the second quoted paragraph of note 70, supra) beginning with the words, "For instance", demonstrates, we think, how far the statute actually goes. The explanation states that "A confederacy * * * to prevent another, by indirect and sinister means, from exercising his trade, and to impoverish him * * *" is a conspiracy. Picketing, however peaceful, would fall within this ban. The means would be "indirect" and, doubtless, would be considered by many to be "sinister". The adjective "sinister" is so little a term of art in the law and is so inadequate as a legal description that we cannot find it in any law dictionary. The Supreme Court of Hawaii in the Kaholokula case, 37 Haw. at pages 625, 636, recognized the right of peaceful picketing, and also indicated, 37 Haw. at page 642, that to deprive an individual of his right to work is to deprive him of "liberty" as employed in Section 11579 of the unlawful assembly and riot act. We agree with both positions and state that to deprive a man of his right to work does deprive him of a precious liberty. But we are concerned with a statute which by reason of its vagueness and uncertainty must be held to be unconstitutional in its entirety. We think it would be fruitless to discuss any other sections of the conspiracy statute, Chapter 243, under the circumstances.

### The Doctrine of Abstention.[71]

If our ruling is correct that we are authorized to adjudicate the cases at bar as a three-judge court pursuant to Section 2281 of revised Title 28, we must deal with the doctrine of "abstention" and will do so shortly. If, on the other hand, we are not authorized by that statute to sit as such a court we adjudicate the instant disputes as the District Court for the District of Hawaii sitting en banc and for reasons stated immediately hereinafter the doctrine of abstention can exercise no effect on our decisions and decrees. Proceeding under the former theory first we will discuss the provisions of Section 2283[72] of revised Title 28.

Section 2283 provides that "A court of the United States may not grant an injunction to stay proceedings in a

---

71 The "doctrine of abstention" is referred to by Mr. Justice Frankfurter in Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 500, 501, 61 S.Ct. 643, 645, 85 L.Ed. 971, where citing such cases as Beal v. Missouri Pacific R. Co., 312 U.S. 45, 61 S.Ct. 418, 85 L. Ed. 577; Commonwealth of Pennsylvania v. Williams, 294 U.S. 176, 55 S.Ct. 380, 79 L.Ed. 841, 96 A.L.R. 1166 and Gilchrist v. Interborough Rapid Transit Co., 279 U.S. 159, 49 S.Ct. 282, 73 L.Ed. 652, he said, "These cases reflect a doctrine of abstention appropriate to our federal system whereby the federal courts, 'exercising a wise discretion', restrain their authority because of 'scrupulous regard for the rightful independence of the state governments' and for the smooth working of the federal judiciary."

72 Section 265 of the old Judicial Code provided: "The writ of injunction shall not be granted by any court of the United States to stay proceedings in any court of a State, except in cases where such injunction may be authorized by any law relating to proceedings in bankruptcy."

State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." Compare the provisions of Section 86 of the Organic Act, as amended, and those of Section 265 of the old Judicial Code quoted in note 72 supra. Because of the provisions of Section 86 of the Organic Act, set out in note 54 supra, the mandate of Section 2283 of revised Title 28 must be imposed in respect to all "matters and proceedings" as between the District Court and the Territorial Courts of Hawaii. But the word "State" as employed in Section 2281 cannot have a different meaning than that which it enjoys when used in Section 2283.[73] If the statutes of Hawaii are not "State" statutes the criminal proceedings complained of by the plaintiffs at our Nos. 828 and 836 are not proceedings in a "State court". The sections of the law referred to cannot be read both ways. They are not Janus-faced. If, therefore, the word "State" used in Section 2281 is not applicable to a statute of the Territory of Hawaii, Section 2283 cannot serve as a bar to action taken by this court to enjoin the criminal proceedings complained of in the cases at bar. We believe, however, for the reasons hereinbefore set out, that the Hawaiian statutes sub judice must be treated as if they were statutes of a State and that the provisions of Section 2283 are applicable.

■ It is clear that the doctrine of abstention from action by injunction by a federal court to restrain proceedings in a State court embodied in Section 2283 of revised Title 28, does not go to the jurisdiction of the federal tribunal but is instead a rule of comity in the form of positive law. Moran v. Sturges, 154 U.S. 256, 14 S.Ct. 1019, 38 L.Ed. 981; Riggs v. Johnson County, 6 Wall. 166, 18 L.Ed. 768. The matter was well put in Feldman v. Pennroad Corporation, D.C.Del., 60 F. Supp. 716, 718, affirmed, 3 Cir., 155 F.2d 773, certiorari denied 329 U.S. 808, 67 S.Ct.

921, 91 L.Ed. 690, wherein it was said, "The statute [Section 265 of the old Judicial Code] is a limitation upon the equity powers of the federal courts. When application is made to a federal court to enjoin proceedings in a state court, the duty devolves upon the federal court to determine whether the petition has alleged facts for which relief is prohibited by the statute or whether the equities of the case require that an injunction issue despite the statutory limitation", citing Smith v. Apple, 264 U.S. 274, 44 S.Ct. 311, 68 L.Ed. 678. In Keegan v. State of New Jersey, D.C., 42 F. Supp. 922, 924, a three-judge Section 266 court stated: "The protection of personal rights secured by the Constitution is as important as the protection of property rights secured by it. Section 265 of the Judicial Code, 28 U.S.C.A. § 379, is not a jurisdictional statute, but one that merely goes to the equity presented by the bill. * * * A federal court therefore may exercise its jurisdiction to prevent the trial of a defendant by a state court where such a trial would invade constitutional rights. Such jurisdiction may be exercised by way of injunction or in habeas corpus proceedings. In [Truax v. Raich, 239 U.S. 33, 37-38, 36 S.Ct. 7, 60 L.Ed. 131, L.R.A.1916D, 545, Ann.Cas.1917B, 283], Mr. Justice Sutherland delivering the opinion of the Supreme Court stated: 'The due and orderly administration of justice in a state court is not to be thus interfered with save in rare cases where exceptional circumstances of peculiar urgency are shown to exist.'"

■ It has always been the case, however, that a federal court may enjoin proceedings in a State court if necessary to assert and protect a rightful jurisdiction. Guaranty Trust Co. of New York v. North Chicago St. R. Co., 7 Cir., 1904, 130 F. 801, certiorari denied 194 U.S. 638, 24 S.Ct. 860, 48 L.Ed. 1161. Section 2283 of revised Title 28 provides that "A court of the United States may not grant an injunction to stay proceedings in a State court except

[73] Both are parts of Chapter 155 and are pari materia. See Reviser's Notes to Section 2283, revised Title 28, United States Code, p. 1910, Title 28 United States Code Congressional Service. The Reviser's Notes state: "The phrase 'in aid of its jurisdiction' was added to conform to section 1651 of this title and to make clear the recognized power of the Federal courts to stay proceedings in State cases removed to the district courts."

as expressly authorized by Act of Congress, or when necessary in aid of its jurisdiction, or to protect or effectuate its judgments." There is no doubt that Congress set up the safeguards of Section 266 of the old Judicial Code and those of Section 2281 of revised Title 28 to guard against too frequent injunctions by the federal courts to restrain action by State officers acting under State statutes. In West Virginia State Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628, 147 A.L.R. 674, the Supreme Court held invalid, on an appeal from a three-judge Section 266 court, a regulation of a state board of education requiring children in public schools to salute the American flag. The regulation referred to must have had the effect to a statute otherwise the impanelment of a Section 266 court would have been held to have been inappropriate. In Grosjean v. American Press Co., 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660, the Supreme Court struck down a statute which had for its purpose the licensing of the press by the imposition of a gross receipts tax for the privilege of engaging in the newspaper business. In Hague v. C. I. O., supra, the Supreme Court held two ordinances requiring the licensing of public meetings in Jersey City void on their face and restrained their enforcement. In Murdock v. Pennsylvania, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292, 146 A.L.R. 81, the Supreme Court, on certiorari to the Superior Court of Pennsylvania, held invalid a municipal ordinance requiring religious colporteurs to pay a license tax as a condition to the pursuit of their activities. These authorities show the general application of injunctive principles by courts of the United States to protect from state action rights guaranteed to the people by the First and the Fourteenth Amendments.

But in the decision of the Supreme Court in Douglas v. Jeannette, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324, lies the difficulty in granting the relief which the plaintiffs seek by way of injunction from this court in order to restrain the Hawaiian authorities from proceeding with the criminal prosecutions. In the Jeannette case the Supreme Court had before it an unconstitutional ordinance (held to be such in Murdock v. Pennsylvania, supra, decided the same day), and the District Court of the United States for the Western District of Pennsylvania, by a single judge, had enjoined threatened criminal prosecutions thereunder. See 39 F.Supp. 32. Jurisdiction in the case was based on Section 24(14) of the old Judicial Code and the Civil Rights Acts. The Supreme Court by Mr. Chief Justice Stone said, 319 U.S. at pages 163, 164, 63 S.Ct. at page 881, 87 L.Ed. 1324: "It is a familiar rule that courts of equity do not ordinarily restrain criminal prosecutions. No person is immune from prosecution in good faith for his alleged criminal acts. Its imminence, even though alleged to be in violation of constitutional guaranties, is not a ground for equity relief since the lawfulness or constitutionality of the statute or ordinance on which the prosecution is based may be determined as readily in the criminal case as in a suit for an injunction. * * * Where the threatened prosecution is by state officers for alleged violations of a state law, the state courts are the final arbiters of its meaning and application, subject only to review by this Court on federal grounds appropriately asserted. Hence the arrest by the federal courts of the processes of the criminal law within the states, and the determination of questions of criminal liability under state law by a federal court of equity, are to be supported only on a showing of danger of irreparable injury 'both great and immediate'", citing, inter alia, Spielman Motor Sales Co. v. Dodge, 295 U.S. 89, 95, 55 S.Ct. 678, 79 L.Ed. 1322; Beal v. Missouri Pacific R. Corp., 312 U.S. 45, 49, 61 S.Ct. 418, 85 L.Ed. 577, and Williams v. Miller, 317 U.S. 599, 63 S.Ct. 258, 87 L.Ed. 489.

In the Spielman case the Supreme Court refused to enjoin a criminal prosecution under Chapter 781 of the Laws of 1933 of New York, Ex. Sess., holding, by Mr. Chief Justice Hughes, that it must appear that [295 U.S. 89, 55 S.Ct. 681] "The danger of irreparable loss is both great and immediate" and that the petitioner had failed to meet this test. In the Beal case the plaintiff railroad had sought an injunction from the District Court restraining State officers from enforcing the Nebraska

Full Train Crew Law. The District Court had granted relief and the Court of Appeals for the Eighth Circuit had affirmed, 108 F.2d 897. The Supreme Court reversed, 312 U.S. at page 49, 61 S.Ct. at page 420, 85 L.Ed. 577, Mr. Justice Stone saying: "No citizen or member of the community is immune from prosecution, in good faith, for his alleged criminal acts. The imminence of such a prosecution even though alleged to be unauthorized and hence unlawful is not alone ground for relief in equity which exerts its extraordinary powers only to prevent irreparable injury to the plaintiff who seeks its aid.", citing, inter alia, Terrace v. Thompson, 263 U. S. 197, 214, 44 S.Ct. 15, 68 L.Ed. 255. Cf. Truax v. Raich, supra, and Hague v. C. I. O., supra.

But in A. F. of L. v. Watson, supra, the Supreme Court, by Mr. Justice Douglas, pointed out that a district court of the United States might enjoin criminal prosecutions based on an amendment to the Florida Constitution in effect outlawing closed-shop agreements if exceptional circumstances and great and immediate danger of irreparable loss to the petitioners, asserted by the pleading, were proved. Accordingly the judgment of the District Court was reversed and the cause remanded. Mr. Justice Douglas stated, 327 U.S. at page 593, 66 S.Ct. at page 766, 90 L.Ed. 873: "But even though a district court has authority to hear and decide the case on the merits, it should not invoke its powers unless those who seek its aid have a cause of action in equity. * * * The power of a court of equity to act is a discretionary one. * * * Where a federal court of equity is asked to interfere with the enforcement of state laws, it should do so only 'to prevent irreparable injury which is clear and imminent.' * * * That is a strict test. But we think appellants satisfy it. We reach that conclusion on the basis of the allegations concerning the disruption of the collective bargaining processes and the injury to the unions and to the employers alike, if the closed-shop agreement is outlawed. As we have said, it is averred that there are about 500 contracts with Florida employers containing closed-shop agreements * * *".

Cf. Terrace v. Thompson, supra, 263 U.S. at page 214, 44 S.Ct. at page 17, 68 L.Ed. 255, where Mr. Justice Butler stated, "But the legal remedy must be as complete, practical and efficient as that which equity could afford. * * * Equity jurisdiction will be exercised to enjoin the threatened enforcement of a state law which contravenes the federal Constitution wherever it is essential in order effectually to protect property rights and the rights of persons against injuries otherwise irremediable; and in such a case a person, who as an officer of the state is clothed with the duty of enforcing its laws and who threatens and is about to commence proceedings, either civil or criminal, to enforce such a law against parties affected, may be enjoined from such action by a Federal court of equity."

In concluding that the decision of A. F. of L. v. Watson has a potent bearing on the disposition of the cases at bar we are not unmindful of the fact that in the cited decision the Supreme Court ordered the cause remanded to the District Court with directions to retain the bill pending the final determination of designated questions of local law. The circumstances of A. F. of L. v. Watson are to be distinguished from the cases at bar on the ground that the Supreme Court of Hawaii in the Kaholokula case held the unlawful assembly and riot act to be constitutional. A most important question of local law therefore has already been decided unfavorably to the plaintiffs in the suits at bar. It should be pointed out, moreover, that the Kaholokula case could not be appealed to the Court of Appeals for the Ninth Circuit for the decision of the Supreme Court of Hawaii was rendered on an interlocutory appeal under the procedure prescribed by Section 9531, Revised Laws of Hawaii 1945.

Even if it were to be held, despite the circumstances, that the decision of the Supreme Court of Hawaii in the Kaholokula case had rendered the question of constitutionality of the unlawful assembly and riot act res judicata as to Kaholokula and his fellow defendants in the proceedings at No. 2657 in the Supreme Court of Hawaii, 37 Haw. 625, or that he or they

could not contest the validity of the statute further because of the operation of a kind of estoppel, nonetheless other plaintiffs at either No. 828 or No. 836 would not be so bound. The short of it is that the determination of local law which the Supreme Court of the United States ordered the District Court in A. F. of L. v. Watson to await and in the meantime to hold its hand, has already taken place in respect to the unlawful assembly and riot act. It follows that under the circumstances of the instant cases if our decision is to be effective we ourselves must pass on the validity of the unlawful assembly and riot act. While the conspiracy statute has not been tested by the Territorial Courts insofar as we are aware, since it forms the basis of only one count of the indictment at No. 2365 we have thought it proper for this court to determine its constitutionality since it would be futile to cut the indictment in half or to truncate the instant proceedings.

We conclude that the prosecutions of the individual plaintiffs must be enjoined. Our conclusion is based not only on the decision of the Supreme Court in A. F. of L. v. Watson but also upon that in Douglas v. Jeannette.

First under A. F. of L. v. Watson our reasons are as follows: As we have stated, the unlawful assembly and riot act and the conspiracy statute of the Territory of Hawaii are unconstitutional upon their face and the impact of the two statutes as employed, and as about to be employed, by the law enforcement authorities of the Territory, is such as to disrupt immediately any substantial possibility or opportunity for genuine collective bargaining between the employers of the sugar and pineapple industries and their respective employees. As we have stated the growing of pineapples and the raising of sugar cane are the two major industries of the Territory. By the very exisentce of the two statutes referred to as well as by reason of the manner of their enforcement by the authorities of the Territory, the scales are weighted so heavily in favor of the employer and against the employee as to render fair collective bargaining a virtual impossibilty under the Labor Management Relations Act, 1947, 29 U.S.C.A. §§ 157, 158. That

Act is applicable in the Territory of Hawaii as we have stated. The Hawaiian statutes effect indirectly the very result which the amendment to the Constitution of Florida under consideration in A. F. of L. v. Watson was designed to effect directly. A court of the United States has a duty to protect interstate commerce under Section 1337 of revised Title 28 U.S.C.A. A court of the United States under Section 1343 of that Title also must protect civil rights as guaranteed by the Constitution and as defined by the Civil Rights Acts. A strike properly conducted is a legitimate weapon in the armory of labor. Peaceful assembly, peaceful picketing, and freedom of speech and of assembly are equally legitimate weapons of labor. Indeed, freedom of speech and of assembly are rights guaranteed to all of us by the Constitution of the United States.

All collective bargaining in the Territory of Hawaii in our opinion is substantially affected by the two statutes as well as by the prosecutions conducted or about to be carried on thereunder. Approximately thirty thousand members of the ILWU and the union itself necessarily feel the impact of the statutes as does each employer in the sugar and pineapple industries. All labor relations in the Islands are clouded by them. On the records presently before us we think it is fair to state that equable or amicable relations between employers and employees in the Territory of Hawaii are impossible while the statutes stand. The repercussions which arise from the enforcement of these statutes of the Territory are such as to cause great and irreparable harm and damage to all labor relations in Hawaii. The danger to labor relations within the Territory is great and immediate for if the full penalty of twenty years, or comparatively heavy sentences, be imposed after trial and conviction on any substantial number of the one hundred and twenty-seven plaintiffs at Nos. 828 and 836, labor on the Islands of Hawaii may, with a measure of justification, conclude that the processes of the law have been employed to reduce its members to virtual peonage. If this were to transpire, in our opinion, many years would pass before an adequate basis for collective bargaining could arise

again. We go further and state that the two statutes are of such a nature as to affect not only labor but all other persons on the Islands and constitute a two-edged weapon with which the liberty of the individual, laboring man or capitalist, may be stricken down at any time.

But there are other and equally cogent reasons why the injunctions prayed for here must issue. As was pointed out by Mr. Chief Justice Stone in Douglas v. Jeannette, 319 U.S. at page 163, 63 S.Ct. 877, 87 L.Ed. 1324, no person is immune from prosecution in *good faith*. But good faith prosecution is an essential if a person is not to be deprived of constitutional rights. The qualification of good faith in a prosecution runs through the line of cases applying the doctrine of abstention. See for example Beal v. Missouri Pacific R. Co., supra, 312 U.S. at page 49 61 S.Ct. 8, 85 L.Ed. 577. The words *in good faith* are of great importance and were intended to draw a line between *bona fide* prosecutions embarked upon to uphold the law and prosecutions for some ulterior purpose or motive. The motive of the prosecutor is of course not relevant to the ordinary criminal proceeding; the material questions ordinarily are whether the defendant has committed the act alleged and whether it constitutes a crime. But prosecutions for motives other than the enforcement of the law have taken place on occasion and in connection with the exercise of the discretion of a district court of the United States to restrain such criminal actions good faith is material under the Civil Rights Acts.

In this connection the following facts among others in the instant cases are pertinent: (1) (a), the mass arrests, and the very broad, indeed, the too broad field, from which the police drew the defendants in the various criminal proceedings after both the Paia and the Kaumalapau Harbor incidents, demonstrated by the fact that the names of sixteen persons were stricken out of one of the complaints and that of ninety-three arrests made on the Island of Oahu on July 13, 1947 · only one person, viz. Sibolboro, was subjected to prosecution, all other complaints being nolle prossed; (b) the naming of persons as defendants in criminal proceedings from photographs taken by the police both prior and subsequent to the occurrence of the Kaumalapau Harbor incident; (c) the fact that the police made no arrests during the course of the Paia or Kaumalapau incidents; (d) the excessive bail required of many of the plaintiffs in the instant cases; (2) the fact that Assistant Chief of Police Freitas did not read the unlawful assembly and riot act to the strikers during the Paia or Kaumalapau incidents and did not contemplate the swearing out of a complaint against any of the plaintiffs under that statute until directed to do so by the prosecuting officers of Maui County; (3) the repeated selection of the unlawful assembly and riot act with its heavy penalties as the vehicle for the prosecution of comparatively minor infractions of the criminal laws; (4) the haste with which the prosecuting officers of Maui County procured the second indictment of Kaholokula and others when the first indictment was held invalid by the Supreme Court of Hawaii; (5) the fact, for we have found it to be a fact, that no one has been prosecuted under the unlawful assembly and riot act except in connection with labor disputes at any time during the life of the Territory; and (6) the fact that the maximum penalty under the unlawful assembly and riot act was increased from five years' imprisonment to twenty years' imprisonment in 1929, following the Filipino workers' strike in 1924. In view of the foregoing we are brought to the conclusion that the threatened prosecutions of the plaintiffs are not "in good faith" within the purview of that requirement as laid down in Douglas v. Jeannette, and that the criminal proceedings complained of are being carried on for the purpose of attack upon a labor movement rather than for the ends of justice.

In making these statements we do not accuse the Attorney General of Hawaii or the prosecuting officers of Maui County in the instant cases of lack of honor or of personal integrity. The labor movement is an unpopular one in the Hawaiian Islands and these gentlemen do no more than reflect the mores of their time and their locality. There is no personal feeling in the attitude of these defendants and we do

not doubt but that they are conscientiously animated by the high desire to maintain industrial prosperity in the Territory of Hawaii. The record seems to indicate beyond peradventure, however, that the unlawful assembly and riot act has been employed as a club to beat labor and that the conspiracy statute is an apt instrument to the same end.

We find that the plaintiffs' remedy at law is not and cannot be "as complete, practical and efficient as that which equity could afford." Terrace v. Thompson, supra, 263 U.S. at page 214, 44 S.Ct. at page 17, 68 L.Ed. 255. The damage will be done to labor relations in the Territory of Hawaii and to the plaintiffs long before the individual cases, if the plaintiffs be found guilty, can reach the Court of Appeals for the Ninth Circuit. The danger of irreparable injury is both great and immediate. In this connection we point out again that the Supreme Court of Hawaii in the Kaholokula case has held the unlawful assembly and riot act to be constitutional upon interlocutory appeal, though it held the indictment insufficient for want of certainty. That decision will bind every court short of the Court of Appeals for the Ninth Circuit and an unconstitutional statute will stand as a basis for present and further prosecutions thereunder.

In holding that injunctions against prosecution of the individual plaintiffs under the unlawful assembly and riot act and the conspiracy statute must issue we do not ignore the fact that it is our duty to follow the interpretation of constitutionality imposed on the statute by the Supreme Court of Hawaii unless, in our opinion, that interpretation is clearly erroneous. After most careful consideration of both the statute and the decision do we conclude that the interpretation of the Supreme Court was erroneous and that the unlawful assembly and riot act is unconstitutional on its face. So regarding the statute and the decision of the Supreme Court of Hawaii it is our duty to proceed as the law requires of us.

Another matter requires brief discussion. Section 266 of the old Judicial Code provided, and Section 2284(5)[74] of revised Title 28 provides, that a three-judge court before final hearing should hold its hand and stay proceedings before it if a suit has been brought in a State court of competent jurisdiction to test the statute complained of and the State court itself has stayed prosecution under the statute pending the completion of the test. See note 74 supra. See Traffic Telephone Workers' Federation of New Jersey v. Driscoll, D.C., 72 F.Supp. 499. It will be observed at once that the provisions of Section 2284(5) are literally inapplicable under the circumstances of the cases at bar for no stay of the threatened or pending criminal proceedings has issued from any court of the Territory of Hawaii. The statute, therefore, not being literally applicable, can have no effect beyond the rule of comity expressed by the Supreme Court of the United States in the Jeannette case.

## As to the Defense of Unclean Hands.

The defendants contend, as we apprehend their position, that the plaintiffs seek to obtain an injunction from this court, " * * * assuring them that their acts will not be indictable as unlawful assembly and riot, so that they may with greater comfort and impunity pursue a course of unlawful conduct."[75] We think the defendants misapprehend the plaintiffs' contentions and the point. Lest they also misunderstand the position of this court the statements which follow are necessary. We do not condone or attempt in any manner to palliate the illegal conduct of the strikers, plaintiffs in these proceedings.

[74] In pertinent part as follows: "A district court of three judges shall, before final hearing, stay any action pending therein to enjoin, suspend or restrain the enforcement or execution of a State statute or order thereunder, whenever it appears that a State court of competent jurisdiction has stayed proceedings under such statute or order pending the determination in such State court of an action to enforce the same. If the action in the State court is not prosecuted diligently and in good faith, the district court of three judges may vacate its stay after hearing upon ten days notice served upon the attorney general of the State."

[75] Defendants' brief p. 96.

But we are required to discharge our duty and we are of the opinion that that duty requires us to enjoin the prosecutions of the plaintiffs under the statutes designated for the reasons given. The doctrine of unclean hands is inapplicable here. If it were otherwise no one who had infringed an unconstitutional statute, no matter how irreparable the damage resulting from the prosecution and no matter how great and imminent the dangers inherent in the statute's enforcement, could cause a district court of the United States to enjoin prosecution thereunder. The application of the doctrine of unclean hands under the theory enunciated by the defendants would have driven the plaintiffs out of court in A. F. of L. v. Watson and would have had a like effect in Traffic Telephone Workers' Federation of New Jersey v. Driscoll, supra.

If our decision in the instant cases is upheld there remains in the armory of the Territory of Hawaii numerous criminal statutes of the kind well known to the States of the United States and adequate for the punishment of lawbreakers.

The Attack on the Jury Commissioners and on the Grand Juries of Maui County.

As to the Right of Kaholokula, et al. to Attack the Indictment Handed Down by the 1947 Maui County Grand Jury.

The complaint for violation of the unlawful assembly and riot statute against Agliam and his co-defendants was dated August 1, 1947, and Agliam and those named in the complaint with him were held for action of the grand jury on September 16, 1947. As we have stated Agliam and his co-defendants were joined as plaintiffs at No. 828 by stipulation and an appropriate order thereon. Barbosa and his co-defendants were named in a complaint based on violations of the unlawful assembly and riot act, dated July 16, 1947. Makekau and his co-defendants were named in a complaint similarly based, dated July 15, 1947. Makekau, et al., and Barbosa, et al., filed motions and challenges to the jury commissioners and to the 1947 grand jury of Maui County at Nos. 2412 and 2413 respectively in the Circuit Court of the Second Circuit of the Territory of Hawaii. The matters raised by the motions and challenges to the jury commissioners and to the 1947 Maui County grand jury were decided by Judge Cristy on September 17, 1947, while the case of Kaholokula, et al., No. 2657 in the Supreme Court of Hawaii, 37 Haw. 625, decided November 26, 1947, was still before that Court. As we have said the constitutionality and the sufficiency of the indictment handed down by the Maui County grand jury on October 30, 1946, Plaintiffs' Exhibit No. 9, were tested by the Supreme Court in the cited case. The Supreme Court of the Territory held the unlawful assembly and riot act to be constitutional but the indictment was deemed to be insufficient in that specific illegal acts of the individuals were not described therein. As has been stated Kaholokula and certain others, plaintiffs at No. 836, had been indicted by reason of the Paia incident. Kaholokula and the other defendants indicted with him made no attack on the jury commissioners and did not challenge the 1947 Maui County grand jury. They do presently attack, by the allegations of the complaint at No. 836, both the jury commissioners of Maui County and the methods used to select grand juries in that county. They offer in support of their contentions the record made before Judge Cristy (sitting vice Judge Wirtz in the Circuit Court of the Second Circuit) under the motions and challenges of Makekau, et al., and Barbosa, et al.[76] The evidence contained in that record will be discussed hereinafter the points raised are substantially those set up in the complaints at our Nos. 828 and 836. The motions and challenges of Makekau, et al., and Barbosa, et al., were filed in the Second Circuit Court on or about July 28, 1947 and were subsequently amended.[77]

The defendants point out that when Judge Cristy's designation was made by the

---

[76] Pursuant to paragraph 11, stipulation 4/23/48. at our No. 828, and also paragraph 9, stipulation 4/23/48 at our No. 836.

[77] We will discuss the challenges and motions as amended. Differentiation between the original motions and charges and the amendments is unnecessary and would be unprofitable.

Supreme Court to the Second Circuit Court, to the end that he could hear the motions and challenges referred to, it was apparent that there were involved in the Kaumalapau Harbor incident not only Makekau and those charged with him but also Barbosa and his co-defendants. This, say the defendants in the cases at bar, is "the very evident reason why the order of the Supreme Court included authorization to Judge Cristy to hear supplementary challenges and why Judge Cristy in disposing of the motions and challenges on September 18, 1947 stated that his rulings would apply to any other case lying before the grand jury."[78] But the case of Kaholokula, et al., was not then lying before a grand jury. The 1946 Maui County grand jury had handed down a true bill against Kaholokula and his co-defendants on October 30, 1946, Plaintiffs' Exhibit No. 9. Moreover, if Kaholokula, and his co-defendants under the indictment of October 30, 1946, believed, as they apparently did, that the unlawful assembly and riot statute would be declared unconstitutional, or that the indictment would be found to be insufficient as actually transpired, there was no reason why they should have challenged the 1947 Maui County grand jury. Actually the earlier indictment had been found by the 1946 Maui County grand jury and that jury was functus officio. Whether or not the indictment was held to be insufficient, the life of the 1947 grand jury would expire on January 12, 1948.[79]

 The Kaholokula case was decided by the Supreme Court on November 26, 1947. The Territory had twenty days after the opinion was announced in which to petition for rehearing.[80] The time for filing a petition for rehearing expired therefore on December 17, 1947. But the 1947 Maui County grand jury met on December 2, 1947 and indicted Kaholokula again and

with him seventy-four other persons in indictment No. 2365, including one individual not designated in the earlier indictment, Plaintiffs' Exhibit No. 9. The later indictment, No. 2365, Exhibit E to the complaint at our No. 836, contains not only a count based on the unlawful assembly and riot act but also a count bottomed on conspiracy, third degree.[81] At the time the indictment, No. 2365, was returned by the 1947 grand jury there had been no remittitur by the Supreme Court to the Second Circuit Court as has been said. The defendants' brief[82] states in regard to this point, "The grand jury undoubtedly had a right to consider and to act upon the case, but were the plaintiffs bound to take notice that they would do so? That is the issue. We cannot foretell the ruling of the territorial court thereon, and it is not material here; they [the defendants] either were bound to take notice that the grand jury would consider the case and waived their opportunity [to challenge], or were not bound to take notice of it and can still present, by plea or motion on arraignment all contentions based on federal rights." The defendants in the instant cases cite Territory v. Ferris, 15 Haw. 139, for comparison. The cited case holds that a defendant charged with murder waives his right to challenge the grand jury if he does not do so prior to the time it retires even though he is held in jail at the time. Section 9812, Revised Laws of Hawaii 1945, provides that any person "held to answer a charge for a criminal offense" may challenge the panel before the grand jury is sworn. The grand jury is impaneled and sworn at the opening of the term.[83] The 1947 Maui grand jury could not have come into office until January 13, 1947, the second Monday in January.

Paragraph "F. Challenges", of Rule 18 of the Rules of the Supreme Court[84] as

---

[78] See transcript of hearings before Judge Cristy, p. 561.

[79] See Section 9638, Revised Laws of Hawaii 1945. The life of the grand jury expires with the end of the term and the new term commenced in the Second Circuit on the second Monday in January, 1948, viz. January 12, 1948. See Section 9802 of the Revised Laws of Hawaii 1945.

[80] See Rule 5 of the Supreme Court of Hawaii. See 36 Haw. at page 756.

[81] Pursuant to Sections 11120–11130 of the Revised Laws of Hawaii 1945.

[82] At p. 138.

[83] Sections 9810–9812 of the Revised the Revised Laws of Hawaii 1945.

[84] See item 7, paragraph 7, stipulation filed April 23, 1948, in No. 828, and item 3, paragraph 7, stipulation filed

amended February 14 and March 27, 1947,[85] provides, "Before the grand jury retires, * * * any person held to answer a charge for a criminal offense may challenge the panel or an individual juror for cause to be assigned to the court. All such challenges shall be tried and determined by the court." We think that the word "retires" as used in the Supreme Court rule means the first retirement by the newly impaneled grand jury after it has been charged by the court. See Section 9811 of the Revised Laws of Hawaii 1945. See such cases as Commonwealth v. Smith, 9 Mass. 107, and People v. Jewett, 3 Wend., N.Y., 314. Territory v. Ferris, supra, is silent on this point, and we can find no pertinent Territorial authority. If we are correct in this ruling the opportunity of Kaholokula and his co-defendants to challenge the 1947 grand jury either under Section 9812 or under Rule 18 of the Supreme Court Rules elapsed long before December 2, 1947 when the indictment, No. 2365, was handed down. A chance to challenge the individual grand juror's competency as distinguished from irregularity of the drawing of the grand jury, still remained. Questions of competency, as distinguished from questions of regularity in the drawing of the grand jury, could be presented on arraignment under the indictment. Cf. Territory v. Scully, 22 Haw. 618, 632, explaining Territory v. Ferris, supra. In the Scully case it was held that a motion to quash an indictment on the ground of irregularities in selecting the list of persons to act as grand jurors, must be made before the jury was sworn. In Territory v. Braly, 29 Haw. 7, 8-10, the Supreme Court of the Territory considered on a plea of abatement a challenge based on alleged failure to apportion properly the citizenry for grand jury service among several precincts but the court's decision was based in fact upon the conclusion that no abuse of discretion had been demonstrated.

The defendants urge that under the rule of Carter v. Texas, 177 U.S. 442, 20 S.Ct. 687, 44 L.Ed. 839, dealing with the exclusion by a Texas court of members of the African race from a grand jury, rights guaranteed by the Constitution of the United States to the plaintiffs in the instant cases could be preserved by a motion to quash the indictment on arraignment. Cf. Territory v. Ferris, supra. But this raises a substantial federal question which, however, melts into the major contentions of the plaintiffs in the instant cases that they have been denied their constitutional rights.

■ We are of the opinion that the defendants named in the indictment No. 2365 did not have a fair opportunity[86] to challenge the 1947 Maui County grand jury and, as we have stated, had no substantial reason for believing that that grand jury would indict them on December 2, 1947; that their objections to the jury commissioners and to the constituency of the 1947 grand jury must be weighed and considered. The question then becomes: Shall this court consider on behalf of Kaholokula and his co-defendants under indictment No. 2365 the motions and challenges, filed by Makekau and Barbosa in the Second Circuit Court which have been made part of the records of the cases at bar by the stipulations of the parties?[87]

---

April 23, 1948, in No. 836. Cf. 36 Haw. at page 763.

Section 9603 of the Revised Laws of Hawaii 1945 provides that the Supreme Court shall have "general superintendence of all courts of inferior jurisdiction * * *". See also Section 83 of the Organic Act, 48 U.S.C.A. § 635.

[85] The changes effected by the amendments seem immaterial insofar as the instant question is concerned. See Rule 18 of the Supreme Court prior to the stated amendments.

[86] As appears from the defendants' brief at p. 137: "In the arguments before the trial we frankly stated to this court that we do not know whether the plaintiffs in Civil No. 836 have had opportunity to challenge the 1947 grand jury."

[87] See paragraph 11 of the stipulation of April 23, 1948, at No. 828, and paragraph 9 of the like stipulation at No. 836. Each pertinent paragraph is as follows: "It is stipulated that the record of the proceedings before the Honorable A. M. Cristy, including the testimony taken as transcribed by the court reporter of the Second Judicial Circuit, said transcript of record having been heretofore filed in this court, shall be deemed in evidence in this case with the same

The defendants insist that all the pertinent evidence on this issue should be stricken out at both numbers and that this court may not consider it. They contend that we do not have the jurisdiction, i. e., *power*, to determine the issue whether a grand jury of the Territory has been properly constituted even if it has been selected in a manner clearly prohibited by the Constitution of the United States. Cf. Cobbledick v. United States, 309 U.S. 323, 60 S.Ct. 540, 84 L.Ed. 783. The defendants endeavor to draw an analogy helpful to them from the federal statute relating to the removal of civil rights cases, Section 31 of the old Judicial Code, presently Section 1443 of revised Title 28, citing Kaizo v. Henry, 211 U.S. 146, 148, 29 S.Ct. 41, 53 L.Ed. 125, a case arising in the Territory of Hawaii, and Andrews v. Swartz, 156 U.S. 272, 276, 15 S.Ct. 389, 39 L.Ed. 422. It is doubtful if the cited cases retain full authority today in view of Johnson v. Zerbst, 304 U.S. 458, 468, 58 S.Ct. 1019, 82 L.Ed. 1461, 146 A.L.R. 357, wherein the Supreme Court held that a trial court would lose jurisdiction, i. e., the power, to try a criminal indictment, if the defendant was denied his constitutional right to assistance of counsel under the Sixth Amendment. It is the law, however, that civil rights cases may not be removed to the federal court unless the denial of civil rights occurs by reason of provisions of a state constitution or statute. Commonwealth of Kentucky v. Powers, 201 U.S. 1, 30, 31; 26 S.Ct. 387, 50 L.Ed. 633, 5 Ann.Cas. 692; Strauder v. West Virginia, 100 U.S. 303, 309, 25 L.Ed. 664; and Virginia v. Rives (Ex parte Virginia), 100 pp. 313, 321, 25 L.Ed. 667.

But assuming, as we must by reason of Section 86 of the Organic Act, as amended, that the Territory of Hawaii stands in the same position to the United States as a State insofar as removal of causes is concerned, we are of the opinion that decisions controlling the removal of civil rights cases to the federal courts nonetheless are not persuasive here. The question presented is not whether the case of the Territory v. Kaholokula, et al., may be removed to the United States District Court for the District of Hawaii, but whether in a suit based upon the Civil Rights Acts this court may consider whether Kaholokula and his co-defendants, plaintiffs at No. 836, have been deprived of rights guaranteed to them by the Constitution of the United States by reason of the methods employed in the selection of the 1947 Maui County grand jury. We are of the opinion that the latter question is within the ambit of the powers conferred upon a district court of the United States by Section 1343 of revised Title 28. See also R.S. §§ 1977 and 1979. The question before us is not how might removal be accomplished but whether the plaintiffs are being deprived of their civil rights. The question at bottom therefore is the same as that previously decided by us. But even if it were not, we nonetheless sit as a court of equity. It is well established that a court of equity, having acquired jurisdiction on adequate grounds should determine all material issues. Our decision should not be truncated. Accordingly, we hold that it is proper for this court to consider the pertinent evidence stipulated into the records at both numbers and to adjudicate the issue involved.

The Evidence Produced on the Motions and Challenges of Makekau and Others and Barbosa and Others to the Jury Commissioners and to the 1947 Maui County Grand Jury.

We state preliminarily that the provisions of the law of the Territory of Hawaii relating to "Jurors" are to be found in Sections 9791 to 9813, inclusive, of the Revised Laws of Hawaii 1945, as amended, and in Section 83 of the Organic Act, 48 U.S.C.A. § 635. We shall not repeat all the provisions of the statutes but we point out that Section 9800 of the Revised Laws of Hawaii 1945 stated in pertinent part "That the jury commission of each circuit shall in each year make and file with the clerk of the circuit court at least ten days before the next term of court two certified, separate lists of citizens to serve respectively as grand and trial jurors in the circuit court

---

effect as if said testimony were adduced by the respective parties in this court, the entire record also being deemed in evidence before this court, subject to all legal objections not hereinabove waived." See note 76 supra.

for the ensuing year. It shall select and list the names of one hundred citizens as trial jurors and fifty citizens as grand jurors * * *", and "All of such selections shall be citizens whom the respective commissions believe, after careful investigation in each case, to be qualified and not exempt under the provisions of this chapter. If practicable, no person shall be selected who has served as a juror or grand juror within one year. All of such selections shall be made without reference to the political affiliations or to the race or place of nativity of citizens, with a view to obtain lists representative of the qualified citizenry of each circuit." The last sentence quoted was amended by L.1945, Act 163, § 1, Section 9800.01, to provide that "No person shall be selected and listed as a grand juror who has been so selected and listed within one year * * *". Section 2 of the statute last designated also added a requirement of three years residence in the Territory, amending Section 9791 of the Revised Laws of Hawaii 1945 to that extent. Section 9791 need not be quoted here. It is sufficient to state that it embodies in substance, the amending residence qualification aside, the provisions of Section 83 of the Organic Act, including those relating to the ability of the juror to speak English. Section 9803 provides for the drawing of the grand jury panel by the clerk of the court by lot in the usual fashion; that is to say the fifty names on the list are put into the "grand jury box" and from these names the clerk selects " * * * not less than thirteen nor more than twenty-three persons to serve as grand jurors * * *". The 1947 grand jury consisted of twenty-one persons so selected. They are the defendants named as grand jurors in the complaints at Nos. 828 and 836.

It will be noted upon an examination of the testimony before this court, from the transcript of the hearings before Judge Cristy and also from a number of the exhibits that the terms "list", "grand jury", "grand jury as a whole", "panel" and "array" have been employed on occasion in a manner which creates some confusion.

The three terms first quoted were generally employed to designate the list of fifty persons selected by the jury commissioners for grand jury service. The terms "panel" or "array" seemingly were used on most occasions to designate the twenty-one grand jurors drawn by lot by the clerk of the court from the list of fifty names selected by the jury commission; for example, the grand jurors named as defendants in the instant occasion. Cf. the respective definitions of "panel" and "array", Bouvier's Law Dictionary, Rawle's Third Revision. In at least two instances, however, the word "panel" was used where the term "list" would have been more appropriate. See Movants' Exhibit No. 15 in the proceedings before Judge Cristy, referred to hereinafter. See also Plaintiffs' Exhibit 26.

The evidence produced on the challenges to the grand jury by Makekau, et al., and Barbosa, et al., in the Circuit Court of the Second Circuit respectively at Criminal Nos. 2412 and 2413, shows that the 1947 Maui County grand jury was not impaneled in accordance with law. This appears from the record of the proceedings before Judge Albert M. Cristy, sitting vice Judge Cable A. Wirtz, in the Circuit Court of the Second Circuit, and made part of the record at both our numbers.[88] The Court allowed but a limited review of the methods employed to select the grand jury and of the individual qualifications of the members thereof. Judge Cristy would not permit what he referred to as a "free for all" examination of the members of the panel upon voir dire. He permitted examination of individual grand jurors on voir dire only to the extent of allowing the defendants' counsel to bring out their respective business connections and general position in the community. The court was apparently of the view that a wider scope of examination of the qualifications of individual members of the panel would be irrelevant. Judge Cristy also excluded evidence which, from the nature of the offers made, would have tended to show more clearly that certain important elements of the community were precluded

---

[88] The challenges are also part of the plaintiffs' bill of particulars which has been made a part of both complaints.

See the references to the stipulations in note 87, supra.

from serving on the grand juries of Maui County. The court, however, permitted enough evidence to come into the record to demonstrate the erroneous method employed in selecting the 1947 Maui County grand jury.

There was evidence which we believe to be credible and from which we find that 84% of the persons who were selected and listed for grand jury service in 1947 came from the ranks of the employer-entrepreneur group and their salaried (non-labor) employees. The record demonstrates also that all other groups in the community, including labor, had approximately but a 16% representation on the 1947 grand jury list.

The word "haole" has been much employed throughout the testimony and, as we stated at an earlier point in this opinion, a satisfactory definition of it is hard to encompass. A haole was defined by a witness (see note 11, supra) as *a person of mainland American or of northern European stock, not a person of Portuguese, Spanish or Puerto Rican descent*. To this we added the gloss of Adams' definition (see note 13, supra) describing the haole as a class of persons of *superior economic and social status*. As indicated previously we accept this composite definition. The dominant position of the haole in the economic life of the Territory of Hawaii has been testified to repeatedly in the instant case and is also fully borne out by such authorities as Burrows [89] and Lind.[90] While we think that the record in the instant cases demonstrates that the haole group and the employer-entrepreneur group in the Islands should be deemed to be almost co-extensive, we shall not so treat them for the purposes of the question now under discussion and will employ the term "haole" as defined in this paragraph.

Employing that definition we find that though the haole group comprised but about 3.6% of the population of Maui County, the 1947 Maui County grand jury list nonetheless contained the names of twenty-one haoles or 42% of the list. On the other hand there were only six laboring men named on the grand jury list, or a total of 12%. Cf. Movants' Exhibits Nos. 7 and 9. But male laborers in Maui County comprised approximately 79% of the total male population of that County. Again see Movants' Exhibit No. 9. Only laborers are named in the indictment at No. 2365 and in the criminal complaints.

It should be observed that the percentage of Koreans, Hawaiians, Puerto Ricans and Filipinos on the list was zero. There were over 10,000 persons of Filipino descent in Maui County in 1946 and 1947 but the 1947 grand jury list contained no Filipinos. The evidence also shows that Filipinos constitute the second largest national group in the Territory. While Filipinos who had not been engaged in the military service of the United States could not become naturalized citizens until 1946 [91] nonetheless the registry of voters at the election which was held on November 5, 1946 [92] demonstrates that many, more than one hundred, male Filipinos were entitled to vote at that election. It will be noted that the provisions of Section 9791 of the Revised Laws of Hawaii 1945 do not require that to be eligible for jury service that the individual must be a registered voter but only that he possess the qualifications for registration as a voter. Questionnaires [93] were submitted to numerous Filipinos along with other members of the community whom it was contemplated might be called for jury service, and though there were numerous Filipinos who were qualified [94] none was called to serve. There were a number of Filipinos indicted under

---

[89] See "Hawaiian Americans", by Edwin G. Burrows, Yale University Press, 1947, pp. 1 to 95. See note 14 supra.

[90] See "An Island Community, Ecological Succession in Hawaii", by Andrew W. Lind, the University of Chicago Press, 1938 at pp. 112 and 255. This book was introduced in evidence in the proceedings before Judge Cristy. See note 14 supra.

[91] See Act of July 2, 1946, 8 U.S.C.A. §§ 703, 724.

[92] These lists were filed with the clerk after the termination of the hearings pursuant to permission granted by the court. They are Plaintiffs' Exhibits 22-A and 22-B.

[93] See Plaintiffs' Exhibits Nos. 23 and 24.

[94] These included Patrick Ortello, Vincente Emgoring and Salvadore Seno.

the indictment at No. 2365 and named in one of the jury commissioners, had served the criminal complaints hereinbefore referred to. These include at No. 828, Diego Barbosa, Victor Degamo, and Basilo Arruiza; at No. 836, Leocadio Baldovi, Calixtro Cason and Juan Hara.

Statistics are sometimes most misleading when they seem the clearest and we would hesitate to base our decision upon them. Filipinos represent about 35% of the male population of Maui County though comparatively few are citizens, and therefore it might be argued that it was by pure inadvertence that all of them were excluded from grand jury duty; that the haole group are in fact better educated than the average citizen of Hawaii, and that therefore, since the jury commissioners are required by law to make a "careful investigation in each case",[95] their selections naturally include more of the better educated members of the community. In this connection we point out again that Section 83 of the Organic Act requires that a juror must be able "understandingly [to] speak, read, and write the English language * * *". The testimony received by Judge Cristy, however, makes it clear, statistics aside, that the exclusion of certain groups of the community was deliberate and intentional.

Pursuant to Section 9799, Revised Laws of Hawaii 1945, the jury lists are made up by three jury commissioners, two of whom are appointed by the judge of the circuit court, the third commissioner being ex officio the judge himself. Augustine Pombo,

one of the jury commissioners, had served as such for an extended period of time, having had fourteen years of consecutive service with the exception of one year, 1945. The other jury commissioner was Claude E. Chatterton. Judge Wirtz, Mr. Pombo and Mr. Chatterton chose the persons comprising the list of the 1947 Maui County grand jury. When Mr. Pombo was asked why there never had been a Filipino on the "Grand Jury" he replied candidly, "We just have a lot of other men a lot better."[96, 97] As to the number of haoles on the grand jury list Mr. Pombo's statements were equally pointed and conclusive and admit of no misunderstanding. He testified in effect that he picked haoles because he wanted to give them something to do "* * * if they want a chance to run the country * * *".[98] The substance of Mr. Pombo's testimony is that haoles were placed on the grand jury so that they might have an opportunity to run the country.

Mr. Pombo's standard of selecting jurymen was also made plain when he stated: "Well, we picked men—majority of them with better education. They are in business in the community." He was then asked, "Was it your feeling that a man in business would be better qualified than a man out of business?" He replied, "He has got a better head on him."[99]

Neither of the other two jury commissioners denied the accuracy of Mr. Pombo's testimony respecting this basis or standard of selection in any particular. What Mr.

[95] See Section 9800, Revised Laws of Hawaii 1945, and Section 83 of the Organic Act, 48 U.S.C.A. § 635. See also Sections 9799 and 9803, Revised Laws of Hawaii 1945.

[96] See p. 312 transcript of proceeding before Judge Albert M. Cristy.

[97] There is a Filipino on the 1948 Maui County grand jury.

[98] See Id. at p. 290. Mr. Pombo testified as follows:
"The Court: Did you pick them because they were haoles?
"Witness [Pombo]: No, I pick them because I want to give them something to do—if they want a chance to run the country—.
"The Court: Did you pick them because of their fairness?

"Witness: Because they are fair. They are in court—they have to be fair. There is another jury—in case it don't go right on the Grand Jury, the trial jury is waiting for them.
"Mr. Resner [Counsel for the defendants in the proceedings in the Circuit Court of the Second Circuit]: What did you mean a moment ago—you said they wanted a chance to run the country? A. Well, they do run the country.
"Q. How do you mean that? A. The majority—lots of these—the Baldwins—they own the place.
"Q. I see. A. And if they want to run politics, just as well give them something to do in courts. They can't run it in here because the population getting too independent."

[99] See Id. at p. 318.

Pombo said respecting methods of selecting persons to comprise the grand jury list seems to us to be conclusive in proving deliberate exclusion of Filipinos from grand jury service as well as a deliberate weighting of the grand jury list in favor of haoles and against the laboring men of the community. We so find.

Judge Wirtz testified that the selection of jurors was made from persons whom the jury commissioners knew, individuals with whom they had had personal contact on a business or social basis.[100] Judge Wirtz' testimony respecting the personal knowledge of the jury commissioners of the persons selected by them to form the list was corroborated by Mr. Pombo and to some extent also by Mr. Chatterton.[101] See Smith v. Texas, 311 U.S. 128, 132, 61 S.Ct. 164, 85 L.Ed. 84.

Section 9800, Revised Laws of Hawaii 1945, provided in respect to the selection of jurors, both grand and petit, that, "If practicable, no person shall be selected who has served as a juror or grand juror within one year." Movants' Exhibit No. 15 in the proceedings before Judge Cristy on the challenges to the jury commissioners and to the 1947 grand jury of Maui County by Makekau, et al., and Barbosa, et al., Criminal Nos. 2412 and 2413, Circuit Court, Second Circuit, Territory of Hawaii, covers the service of members of the Maui County grand jury panels from 1942 to 1947, inclusive. The exhibit, however, was so qualified by the testimony of Judge Wirtz[102] that it appears that the term "service" as employed in the exhibit meant listing on the grand jury lists rather than actual service on a grand jury. Assuming, as we think we must, that the terms "service" and "served" as employed in the exhibit mean being named on a grand jury list, rather than actual service on a grand jury, i. e., being called and sworn to serve thereon, the exhibit is enlightening nonetheless as to the methods employed in constituting grand jury lists in Maui County for it demonstrates that 54 individuals were listed to serve for 141 years of a total of 300 man-years (50 men on each jury list for 6 years) during the period indicated. It does appear, however, from the testimony taken before Judge Cristy that there was no person on the 1947 grand jury list who had been listed as a grand juror in Maui County in 1946.

Section 9800 stated, prior to amendment, that if practicable no person should be selected who had served as a juror within in a year. Section 9800, as we have said, was amended by L. 1945, Act 163, § 1, Section 9800.01, to provide that no person should be selected and listed as a grand juror who had been *so* selected and listed within one year and that no person should be selected and listed as a trial juror who had been *so* selected and listed within one year. The law as amended became effective on May 14, 1945, subject to a qualification not here pertinent. Despite these provisions, however, it will be observed from Plaintiff's Exhibit No. 26 that at least seven persons (at least six of whom were haoles) who were listed on the 1945 Maui County grand jury list were listed again on the 1946 list. It will be remembered that the 1946 grand jury returned the first indictment, Plaintiffs' Exhibit No. 9, against Kaholokula and others based on the unlawful assembly and riot act of the Territory of Hawaii. The names of the seven men to whom we have referred are H. B. Benner, F. G. Bush, A. J. Collins, Wm. Dickson, F. J. S. Gay, J. W. Hoxie, and E. F. Sabin. The 1946 indictment of Kaholokula, et al., was quashed by order of the Supreme Court of Hawaii following its opinion in Territory of Hawaii v. Kaholokula et al., 37 Haw. 625, and the facts stated have no specific bearing on the 1947 grand jury list. They are illuminating, however, in view of what we have previously stated in respect to the handling of grand jury lists in the Circuit Court, Second Circuit, and they are pertinent insofar as they serve to corroborate Pombo's testimony set out in note 98, supra.

 Section 83 of the Organic Act provides inter alia that "* * * all juries shall be constituted without reference to

---

[100] See Id. at pp. 161-162.
[101] See Id. at pp. 354 et seq.

[102] Id. at pp. 242-245.

the race or place of nativity of the jurors". Yet the questionnaires in evidence [103] submitted to each prospective juror in every instance require a statement as to where the individual was born and the nationality of both his father and mother. True, "race" is not "nationality" if the two words be employed in a strict ethnological sense but commonly the word "race" is used to denote "The descendants of a common ancestor; a family, tribe, people, or nation * * *" [104] We are of the opinion that the questions to which we have referred were in fact directed to "race" as that word is used in the ordinary or common sense and, therefore, indirectly at least, referred to "place of nativity" in derogation of Section 83 of the Organic Act. The questionnaires seem to have been employed for no purpose within the law insofar as the 1947 grand jury was concerned. See Section 9791, Revised Laws of Hawaii 1945.

In view of the foregoing we con- clude that the 1947 Maui County grand jury was constituted illegally. The provisions of the Fifth Amendment to the Constitution of the United States apply to the Territory of Hawaii. See Hawaii v. Mankichi, 190 U.S. 197, 211, 23 S.Ct. 787, 47 L.Ed. 1016. Cf. Andres v. United States, supra, 333 U.S. at page 748, 68 S. Ct. 880. The exclusion of Filipinos from grand jury service for the reason given by Pombo falls clearly within the prohibition of that line of cases beginning with Strauder v. West Virginia, 100 U.S. 303, 25 L. Ed. 664, and running through Smith v. Texas, supra, to Patton v. Mississippi, 332 U.S. 463, 68 S.Ct. 184. There was also, as we have indicated, a deliberate substantial exclusion of wage earners and a deliberate substantial weighting of the grand jury list in favor of "businessmen", in the instant cases, really the employer-entrepreneur which includes the haole group of Maui County. This also is prohibited. In Thiel v. Southern Pacific Co., 328 U.S. 217, 220–224, 66 S.Ct. 984, 985, 90 L.Ed. 1181, 166 A.L.R. 1412, the Supreme Court by Mr. Justice Murphy stated:

"The American tradition of trial by jury, considered in connection with either criminal or civil proceedings, necessarily contemplates an impartial jury drawn from a cross-section of the community. * * * This does not mean, of course, that every jury must contain representatives of all the economic, social, religious, racial, political and geographical groups of the community; frequently such complete representation would be impossible. But it does mean that prospective jurors shall be selected by court officials without systematic and intentional exclusion of any of these groups. Recognition must be given to the fact that those eligible for jury service are to be found in every stratum of society. Jury competence is an individual rather than a group or class matter. That fact lies at the very heart of the jury system. To disregard it is to open the door to class distinctions and discriminations which are abhorrent to the democratic ideals of trial by jury. * * * Wage earners, includ- ing those who are paid by the day, constitute a very substantial portion of the community, * * * a portion that cannot be intentionally and systematically excluded in whole or in part without doing violence to the democratic nature of the jury system. Were we to sanction an exclusion of this nature we would encourage whatever desires those responsible for the selection of jury panels may have to discriminate against persons of low economic and social status. We would breathe life into any latent tendencies to establish the jury as the instrument of the economically and socially privileged. That we refuse to do."

Compare Fay v. New York, 332 U.S. 261, 67 S.Ct. 1613, 91 L.Ed. 2043. In the cited case the Supreme Court held that consistent with due process of law required by the Fourteenth Amendment a State could try a defendant charged with a crime by a special or "blue ribbon" jury. Mr. Justice Jackson distinquished carefully, however, between State and federal juries and the decisions respecting each. See 332 U.S. at page 284 et seq., 67 S.Ct. 1613, 91

---

[103] Plaintiffs' Exhibits 23 and 24.

[104] See Webster's New International Dictionary, 2nd Edition.

L.Ed. 2043, and compare Moore v. New York, 333 U.S. 565, 68 S.Ct. 705.

 It is clear that the Territory of Hawaii and its Legislature, Executive Officers and Judiciary, can exercise only the powers delegated to them by Congress, and that Congress cannot deny the right of trial by jury as guaranteed by the Sixth Amendment or indictment by a grand jury under the Fifth Amendment. The constitutional guarantee requires that no group in the community shall be excluded deliberately from jury service and that a grand jury panel shall constitute a fair cross-section of the country or locality from which it is drawn. The 1947 Maui County grand jury was constituted in disregard of these fundamental principles, as well as of others of importance embraced in the local law as we have indicated.[105] We, therefore, have no hesitancy in enjoining the prosecution of the individual plaintiffs under indictment No. 2365, even if that prosecution was not to be restrained for the reasons stated under the earlier heading of our opinion.

The plaintiffs also charge the jury commissioners with bias and prejudice and point out that Mr. Pombo, Mr. Chatterton and Judge Wirtz are still in office. This court would be without power to remove them from office, even if we were of the opinion that the facts warranted such action. The challenges to individual members of the grand jury were not sufficiently developed in the evidence possibly because of the exclusion of evidence by the Circuit Court of the Second Circuit which tried the proceeding. Under these circumstances there can be no point in further discussion.

Respecting the Qualifications of Certain Plaintiffs to Maintain Suit and Questions of Misjoinder, or Lack of Capacity of Certain Defendants to be Sued.

 As we have indicated we entertain no doubt of the right of the individual plaintiffs, who are defendants in the various criminal proceedings which we have referred to, to maintain the suits at bar under the Civil Rights Acts. So much we think is clear, but do the ILWU, Kawano at No. 828 and Rania at No. 836, possess the right to maintain suits?

 The Court of Appeals for the Third Circuit in the Hague case, supra, 101 F.2d at page 709, for the reasons therein stated, held that unincorporated associations, labor unions, were proper parties and possessed the capacity to conduct in the interests of their respective members a suit based on the Civil Rights Acts. Mr. Justice Roberts in his opinion in Hague v.

---

[105] The plaintiffs assert as another ground of challenge to the 1947 Maui County grand jury that no women were included. Put briefly, the argument made by the plaintiffs runs as follows: Section 83 of the Organic Act, 48 U.S.C.A. § 635 provides that " * * * no person who is not a male citizen of the United States * * * shall be a qualified juror or grand juror in the Territory of Hawaii." See also the similar provision of Section 9791, Revised Laws of Hawaii 1945. By the Act of June 26, 1930, 46 Stat. 818, the qualifications of electors of the Territory was amended by striking from Section 60 of the Organic Act, 48 U.S.C.A. § 617, the word "male" so that women are now qualified electors in the Territory. The Nineteenth Amendment to the Constitution of the United States, effective August 26, 1920, provides that "The right of citizens of the United States to vote shall not be denied or abridged by the United States, or by any State on account of sex." The plaintiffs contend that with the adoption of the Amendment " * * * women became qualified jurors since the qualifications for jury service existing as of that time were the same as for electors." Cf. Ballard v. United States, 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 181, and see State v. Walker, 192 Iowa 823, 185 N.W. 619 and State v. Hickman, 195 Iowa 765, 771, 193 N.W. 21.

But the provisions of the Nineteenth Amendment guarantee to women who are citizens of the United States only the right to vote. Section 83 of the Organic Act, 48 U.S.C.A. § 635, has not been amended, that statute still providing that jurors shall be male citizens. Section 9791, Revised Laws of Hawaii 1945, as amended, follows in respects here pertinent, the language of Section 83 of the Organic Act. The enlargement of the group of electors of the Territory by adding women thereto by statutory enactment pursuant to the mandate of the Nineteenth Amendment cannot automatically qualify women as jurors in the territorial courts of Hawaii. The point asserted by the plaintiffs is lacking in merit.

C. I. O., supra, 307 U.S. at page 514, 59 S.Ct. 954, 963, 83 L.Ed. 1423, disagreed. Basing his opinion on the privileges and immunities clause of the Fourteenth Amendment, he pointed out that "Natural persons, and they alone, are entitled to the privileges and immunities which Section 1 of the Fourteenth Amendment secures for 'citizens of the United States.' Only the individual respondents may, therefore, maintain this suit." While this opinion is entitled to great weight we think that the rights guaranteed by the First Amendment are protected from abridgment by a State by virtue of the due process clause of the Fourteenth Amendment. See the opinion of Mr. Justice Stone in the Hague case, and Saia v. New York, 334 U.S. 558, 68 S.Ct. 1148. The privileges and immunities secured to citizens against encroachment by the States under the Fourteenth Amendment are substantially identical, insofar as the instant cases are concerned, with those guaranteed to any individual against impairment by the federal government under the First Amendment. We can perceive no reason, in the light of history, why an unincorporated association should not be held to be "a person" within the meaning of the Fifth or Fourteenth Amendment. Moreover, in A. F. of L. v. Watson, supra, the Supreme Court seemed to entertain no doubt of the capacity of the union to maintain a suit to test the constitutionality under the Federal Constitution of an amendment to the Constitution of Florida. It may have been argued in the cited case, as in effect it was argued in the instant cases, that the interest of the union was too remote to give it locus standi. See 327 U.S. at pages 582, 587, 66 S.Ct. 761, 90 L.Ed. 873. Cf. Grosjean v. American Press Co., supra, 297 U.S. at page 244, 56 S.Ct. 444, 80 L.Ed. 660. But in any event the decision in A. F. of L. v. Watson is governing here and we hold that the ILWU is entitled to maintain the instant suits as a party plaintiff. This is so whether the suit be maintained as a true class action under Rule 23 (a) (1) of the Federal Rules of Civil Procedure, 28 U.S.C.A., made applicable in the District Court of the United States for the District of Hawaii by Section 86a of the Organic Act, 48 U.S.C.A. § 646, [see revised 28 U.S.C.A. § 2072 and Reviser's note], pursuant to Section 1337 of Revised Title 28 United States Code Annotated, or under Rule 23 (a) (3), as a spurious class suit to redress the deprivation of civil rights under Section 1343 of revised Title 28 United States Code Annotated. See Deckert v. Independence Shares Corp., 311 U.S. 282, 61 S.Ct. 229, 85 L.Ed. 189. Accordingly the motions to dismiss it as a party will be denied.

The defendants have made like motions to dismiss as to Kawano and Rania who, as has been stated, have sued as members and officials of the ILWU as well as individually. Their representative statuses are clear and it is unnecessary for Kawano at No. 828 to rely for a representative capacity on his presidency of the now defunct Territorial Council of the ILWU. We think that both of these individuals are entitled to maintain the representative actions in which they appear as plaintiffs. See Rule 23 (a) (3) of the Federal Rules of Civil Procedure. See United Mine Workers v. Coronado Co., 259 U.S. 344, 385, 42 S.Ct. 570, 66, L.Ed. 975, 27 A.L.R. 762; United States v. White, 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542, 152 A.L.R. 1202. Cf. Montgomery Ward & Co. v. Langer, 8 Cir., 168 F.2d 182, 187. The motions to dismiss as to Kawano and Rania will be denied.

As to the Territorial Council of the ILWU, a plaintiff at No. 828, since it was no longer in existence at the time the cases were tried, it will be dismissed as a plaintiff.

A number of the defendants have moved to dismiss on the ground that no cause of action has been stated as to them or on the ground of misjoinder or for other reasons. Judge Cable A. Wirtz has been sued individually as a Circuit Court Judge and as Jury Commissioner of the County of Maui, and Messrs. Pombo and Chatterton have been sued both individually and as Jury Commissioners of Maui County. The 1947 Maui County grand jury like that of 1946 is now functus officio. This court has no power over Judge Wirtz or over Mr. Pombo or Mr. Chatterton as jury com-

missioners as we have already indicated. We cannot undertake to govern their future actions by prescient decrees. The relief sought against Judge Wirtz seems to be sought solely against him as a jury commissioner.[106] The prayers of the respective complaints do not seek to restrain him in any other way. It follows that no relief has been sought against these defendants either individually or otherwise which can be granted by this court. Accordingly they will be dismissed as defendants.

What has been said respecting Judge Wirtz and the two other jury commissioners is true in substance as to the twenty-one grand jurors who comprised the 1947 Maui County grand jury and who are named as defendants both individually and as grand jurors. The work of that grand jury is over and done and its members have been discharged. There is no basis for present injunctive relief against them or any of them. Accordingly they will be dismissed as defendants. We note parenthetically that none of the individual grand jurors at No. 836 was served with process. This constitutes an additional ground for the dismissal of the suit at No. 836 as to them.

The Honorable Ingram M. Stainback has been named as a defendant both individually and as Governor of the Territory of Hawaii. Section 67 of the Organic Act, 48 U.S.C.A. § 532, states that "The governor shall be responsible for the faithful execution of the laws of the United States and of the Territory of Hawaii within the said Territory * * *". Section 9572, Revised Laws of Hawaii 1945, provides, "* * * the [Judiciary] department and the several judges and other judicial officers thereof shall in all respects be independent of both the executive and legislative departments. The governor shall have no power to interfere with, alter or overrule any order, writ, judgment or decision of any court, judge or other judicial officer, except in the exercise of the power to grant reprieves and pardons in pursuance of law." If there be a conflict between the provisions of Section 67 of the Organic Act and Section 9572 of

the Revised Laws of Hawaii 1945, it is unnecessary to resolve it for there is not an iota of evidence to prove that Governor Stainback had any connection with any of the prosecutions complained of. Accordingly the complaints will be dismissed as to him for want of equity.

Walter D. Ackerman, Jr., has been sued individually and as Attorney General of the Territory of Hawaii. It is contended that he was appointed to office after the happening of the events complained of and therefore should not be held as a party defendant. It should be noted, however, that Mr. Ackerman took office on October 14, 1947, and Joseph Kaholokula, et al., were indicted (second indictment) December 2, 1947. The relief which we shall grant, however, will be injunctive in its nature and the laws of the Territory of Hawaii require that the Attorney General "* * * shall appear for the Territory personally or by deputy, in all courts of record, in all cases criminal or civil in which the Territory may be a party, or be interested, and may in like manner appear in the district courts in such cases." Section 1501, Revised Laws of Hawaii 1945. Section 1502, Revised Laws of Hawaii 1945, provides inter alia, that the Attorney General "* * * shall be vigilant and active in detecting offenders against the laws of the Territory, and shall prosecute the same with diligence * * *". In view of all the circumstances it would be improper to dismiss Mr. Ackerman as a party defendant. Accordingly the motions to dismiss as to him will be denied.

E. R. Bevins has been sued individually and as County Attorney for the County of Maui, and Wendell F. Crockett, Deputy County Attorney of Maui County, has also been sued individually and as Deputy County Attorney. By Section 6271, Revised Laws of Hawaii 1945, Mr. Bevins is made a deputy to the Attorney General for the purposes of law enforcement, and Mr. Crockett is Mr. Bevins' deputy. They are properly in the cases as defendants and must remain. They have moved to dismiss the complaints on the ground of lack of equity. The motions will be denied.

---

[106] See paragraph XI of the Complaint at No. 828 and paragraph X of the complaint at No. 836.

Jean Lane has been sued at No. 828 individually and as Chief of Police of Maui County. As the chief law enforcement officer of that County he is properly a party to the proceedings. See Sections 6472-6474, Revised Laws of Hawaii 1945. Accordingly the motion to dismiss as to him will be denied.

The motions heretofore made in the cases for more definite statements, to strike the complaints, to dismiss the actions and for summary judgments, were denied at preliminary stages for what the court deemed to be sufficient reasons and in order that these long pending litigations might be proceeded with promptly. Thereafter, these motions were renewed at the suggestion of the court and were taken under advisement. They will now be denied.

All motions made by the parties to strike testimony or documentary evidence will be denied.

All other points raised by the respective parties have been considered by the court but require no discussion.

### Conclusion.

Decrees will be entered at Nos. 828 and 836, mutatis mutandis, in accordance with the relief to be granted under this opinion to the respective parties and movants, and, in particular adjudging the unlawful assembly and riot act and the conspiracy statute of the Territory of Hawaii to be void as unconstitutional and restraining the defendants Ackerman, Bevins, Crockett, and Lane and their respective agents and deputies and their successors in office from proceeding with the prosecution of the individual plaintiffs as designated herein under any complaint or indictment based on the unlawful assembly and riot act or the conspiracy statute of the Territory of Hawaii. The decrees will be so framed that the benefits thereof shall inure to the ILWU, and to Kawano and Rania in their respective representative capacities.

We believe that all necessary findings of fact and conclusions of law are contained in this opinion as contemplated by Rule 52 (a) of the Federal Rules of Civil Procedure.

Decrees may be submitted.